714 F.2d 614
 32 Fair Empl.Prac.Cas. (BNA) 688,
32 Empl. Prac. Dec. P 33,758
David L. RASIMAS, Plaintiff-Appellant, Cross-Appellee,
v.
MICHIGAN DEPARTMENT OF MENTAL HEALTH, Defendant-Appellee,
Cross-Appellant.
 Nos. 80-1735, 80-1736.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 5, 1982.
Decided July 28, 1983.
 
 David M. Gubow, Goodenough, Smith & May, Bloomfield Hills, Mich., Ralph Sirlin (argued), Partovich & Sirlin, Southfield, Mich., for plaintiff-appellant, cross-appellee.
 Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., George L. McCargar, Jr., Craig Atchinson (argued), Asst. Attys. Gen., Lansing, Mich., for defendant-appellee, cross-appellant.
 Before KEITH and JONES, Circuit Judges, and HOFFMAN,* Senior District Judge.
 KEITH, Circuit Judge.
 
 
 1
 In this sex discrimination action David Rasimas alleged that the Michigan Department of Mental Health terminated him from his supervisory position because of his sex. The district court agreed, but found that he had not timely filed this action with the Equal Employment Opportunity Commission ("EEOC"). The court also determined that his refusal to interview for a non-supervisory position with the Michigan Department of Mental Health constituted a failure to mitigate damages. We affirm the sex discrimination finding, but reverse the timeliness and mitigation of damages determinations.
 
 I.
 
 2
 On August 13, 1972, defendant-appellee Michigan Department of Mental Health ("MDMH") hired Rasimas as a Recreation Activities Training Aide 05 ("Recreation Aide") at their Northville Residential Training Center ("Northville").[1] Northville supervisory personnel later transferred Rasimas from recreation. He became a speech and language classroom instructor.
 
 
 3
 In the spring of 1975, Rasimas was recommended for promotion by Janet Nagy, Director of Nursing Programs, and Caron Bender Swietec,[2] the supervising Mental Retardation Program Supervisor 10. Nagy, Swietec, and Maynard McDonald, the personnel officer at the Macomb Oakland Regional Center ("MORC"), were aware that Rasimas had no prior supervisory experience and that there were personnel problems at Hoover Nursing Home.[3] Nevertheless, each was confident that Rasimas could resolve the problems and gain the necessary supervisory skills from management seminars and on-the-job training. On May 18, 1975, McDonald promoted Rasimas to Mental Retardation Program Supervisor 10 ("Supervisor 10") at Hoover Nursing Home.
 
 
 4
 At an initial orientation meeting, Swietec discussed the functions of a Supervisor 10. She told Rasimas that he was required to manage the therapeutic program which had been developed for the mentally and physically handicapped children at the home. Swietec also identified several personnel problems which required corrective action. These problems included excessive numbers of personal phone calls, neglect of proper working hours, and a failure to observe the proper channels for communicating with Nagy and MORC Director David Rosen.
 
 
 5
 During the initial period of Rasimas' tenure, Nagy was away on vacation. Swietec consequently, was forced to perform many of Nagy's functions as well as her own. Rasimas meanwhile attempted to fulfill the functions of his position. Following the orientation meeting, he prepared a memorandum addressing the personnel problems Swietec had identified. The memorandum was sent to staff members and posted in the staff office. Staff members read, initialed, and returned the memorandum. Some memorandum were, however, returned defaced with graffiti.[4]
 
 
 6
 Swietec began receiving complaints concerning the "difficult" relationship between Rasimas and the staff as early as June 5, 1975. Deborah LaFrate, a recreation aide under Rasimas' supervision, disagreed with the memorandum which had been circulated. She believed that there had never been a problem with punctuality, scheduling, or excessive numbers of personal calls. Other staff members alleged that Rasimas was insensitive to their needs and interfered with the performance of their duties.
 
 
 7
 Rasimas, by contrast, maintained that the staff was hostile and uncooperative.[5] Swietec concurred in Rasimas' assessment, but continued to accept complaints from staff members who had bypassed Rasimas. In the days following June 5, she conferred with Rasimas and the disgruntled staff separately. Swietec did not, however, follow "standard procedure" and conduct joint meetings with Rasimas and his staff. Such meetings had been conducted when similar problems arose for plaintiff's female predecessor.
 
 
 8
 Nagy was also aware of the all female staff's hostility toward Rasimas. She eventually met with Rasimas on two or three occasions to offer advice. Nagy found Rasimas "receptive to her suggestions." Swietec had a similar reaction, but felt Rasimas' listening skills could be improved.
 
 
 9
 At one of the June meetings, Nagy told Rasimas, in Swietec's presence, "The girls are out to get you." Swietec agreed. She believed that the females on the Herbert Hoover staff were unaccustomed to close supervision, and would be likely to react negatively to anyone in plaintiff's position. In fact, as late as June 25, 1975, Swietec noted that "about half" of the staff's complaints against Rasimas were unwarranted. She believed the staff was attempting to use Rasimas as a "scapegoat."
 
 
 10
 Nagy, meanwhile, concluded that Rasimas had not been making sufficient progress and that a written evaluation was appropriate. In a memo dated July 1, 1975, Swietec critiqued Rasimas' performance. The counseling memo described Rasimas' supervisory weaknesses as follows: 1) the exercise of poor judgment in assuring the safety of resident patients; 2) ineffectively implementing supervisory directives to enforce rules applicable to his staff; and 3) failing to take notes and disseminate information acquired at a behavioral conference. Neither Nagy nor McDonald believed that the criticisms contained in the counseling memo of July 1, 1975, constituted grounds for terminating Plaintiff.
 
 
 11
 On Saturday, July 12, 1975, Rasimas and three staff members took four resident-patients of the Hoover Nursing Home on a pre-arranged trip to Belle Isle. Near the mid-point of the trip, one of the patient-residents began to vomit. LaFrate, a recreation aide on probationary status, stated the child's condition was characterized by trembling, vomiting, and blueness near the edges of the mouth.[6] Rasimas, the driver of the van, pulled into a nearby parking lot and examined the child. He satisfied himself that the child had a normal pulse, was breathing well, and had stopped vomiting. Rasimas concluded that the child was experiencing a non-serious bout of motion sickness. LaFrate and another staff member disagreed and urged that medical attention be sought. Rasimas determined that all the child needed was rest, which could be provided at Belle Isle without disrupting the outing for the other children.
 
 
 12
 At Belle Isle, Rasimas directed a staff attendant to stay with the sick child while she lay on a blanket. The remainder of the party spent the next hour having a picnic lunch and touring the Belle Isle Children's Zoo. Just prior to returning, LaFrate observed that the sick child appeared weak and lethargic.
 
 
 13
 Rasimas directed a staff attendant to take the sick child to a nurse as soon as they arrived at the Hoover Nursing Home. A nurse examined the child, but deemed it unnecessary to call a doctor.
 
 
 14
 On Monday, July 14, 1975, a nurse at the Hoover Nursing Home approached Marilyn Whitmer, a recreation aide, and gave her a second-hand account of the Belle Isle trip. Whitmer immediately contacted Swietec and requested that she hold a meeting with the staff members who participated in the Belle Isle trip. Swietec directed staff members to submit written reports describing the trip. Swietec also contacted Nagy, who in turn contacted McDonald. McDonald discussed the trip with LaFrate, the recreation aide who had disagreed with Rasimas' decision to continue the trip.
 
 
 15
 Nagy did not personally investigate the allegations against Rasimas. Nevertheless, later that afternoon she and Swietec recommended that Rasimas be dismissed. McDonald accepted the recommendations, and summarily terminated Rasimas. At no time prior to, or during July 14, had Rasimas been consulted concerning the events of the Belle Isle trip. In fact, July 14 was Rasimas' day off. He did not learn of the reports against him until the day after the termination decision had been made.
 
 
 16
 On July 15, 1975, Rasimas met with McDonald and Swietec. He was informed of the reports against him and given the option to resign or be fired. He was, however, given a few hours to consider these options and make preparations to leave. Later, Rasimas resigned and signed an employee departure report with the annotation "signed under protest".
 
 
 17
 Rasimas began looking for other employment. A short time after the termination MDMH paid Rasimas for pension contributions, accumulated sick leave, and accumulated vacation leave. MDMH hired Lynn VanBundy, a female, to replace Rasimas.
 
 
 18
 On July 28, 1975, Rasimas filed a grievance with the Michigan Civil Service Commission. On August 7, 1975, a meeting was held pursuant to Step 3 of the Michigan Civil Service Commission grievance procedure. The dismissal was affirmed.
 
 
 19
 Rasimas appealed the decision to the Step 4 level. On October 16, 1975, a hearing was held before a hearing officer. Subsequently, the Michigan Civil Service Commission directed McDonald to list the factors which caused him to terminate Rasimas. In a letter dated October 22, McDonald identified the following four factors: 1) the failure to maintain good relationships with program staff and Hoover Nursing Home staff; 2) the failure to follow supervisory instructions; 3) the failure to provide adequate precautions for the health and safety of residents; and 4) the lack of adequate progress in acquiring supervisory skills. On November 21, 1975, an additional hearing was conducted. On February 6, 1976, the hearing officer found that Rasimas was terminated for good cause, but that the dismissal was an overly harsh action. The Hearing Officer's decision recommended that backpay be denied, and Rasimas be demoted to recreation aide. It further provided that he be placed on the layoff register until an opening occurred. Rasimas appealed the Hearing Officer's decision. He was not notified that MDMH had implemented the Hearing Officer's recommendations.
 
 
 20
 On March 16, 1976, he filed a complaint against MDMH with the Michigan Department of Civil Rights.[7] The next day he signed the formal charge prepared by the Equal Employment Opportunity Commission.
 
 
 21
 On April 20, 1976, Swietec sent Rasimas a form letter asking him to interview for a recreation aide position. The form letter did not inform him of the actual availability of the position, or of his right of first refusal regarding the position. In a letter dated April 30, 1976, Rasimas declined to interview, citing his pending complaint against MORC for dismissing him.
 
 
 22
 Rasimas continued his efforts to obtain substantially equivalent employment. In fact, he attended several interviews, took employment examinations, and sought employment with government agencies, hospitals and private clinics. One of the examinations Rasimas passed qualified him to become a paramedic with the Detroit Emergency Medical Service.[8] Despite these efforts Rasimas was unable to obtain suitable employment. Rasimas' only source of income prior to trial was unemployment compensation and later, general assistance payments from the state.
 
 
 23
 On March 18, 1977, the Commission affirmed the Hearing Officer's decision. A few weeks later, on April 7, the EEOC issued a "notice of right to sue" letter. On July 11, 1977, Rasimas filed the present sex discrimination action in the United States District Court for the Eastern District of Michigan.
 
 
 24
 On August 20, 1980, a bench trial was conducted. The court found that 1) the action was timely filed with the EEOC; 2) Rasimas' termination was the result of sex discrimination; and 3) that Rasimas failed to mitigate his damages when he refused to interview for the activities aide position. Rasimas and MDMH each appeal that portion of the district court's opinion adverse to their position.
 
 II.
 Timeliness:
 
 25
 The timely filing of a complaint with the EEOC is a procedural prerequisite to the enforcement of a Title VII action in federal court. This requirement, however, is not jurisdictional, rather it is in the nature of a statute of limitations. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), reh'g denied, Independent Federation of Flight Attendants v. Trans World Airlines, Inc., 456 U.S. 940, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982). A charge of discrimination should be filed with the EEOC within 180 days after the last discriminatory act. 42 U.S.C. § 2000e-5(e).[9] However, in deferral states, states with fair employment agencies, claimants must file charges with the state agency before pursuing their claims with the EEOC. 42 U.S.C. § 2000e-5(c).[10] The EEOC will not formally file charges it has received until after the state agency has terminated its proceedings or sixty days have elapsed, whichever occurs earlier. Mohasco Corp. v. Silver, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). In deferral states all complaints must be filed with the EEOC within 300 days after the act of discrimination or within thirty days after receiving notice that the state has terminated its proceedings. 42 U.S.C. § 2000e-5(e).
 
 
 26
 In the present case, MDMH argues that the present action is untimely without regard to whether the 180 day filing period or the 300 day filing period applies. MDMH acknowledges that Rasimas initiated complaints at the EEOC and the Michigan Civil Rights Commission ("Commission") on March 16, 1975, some 244 days after the termination. MDMH points out, however, that the Commission lacks jurisdiction over complaints filed more than ninety days after the discriminatory act. Mich.Comp.Laws Ann. § 423.307(b). On March 16, the Commission did not have the "authority to grant or seek relief" from the alleged discriminatory practice as required by 42 U.S.C. § 2000e-5(e). Consequently, MDMH argues the 300 day limitation period which is available when a deferral agency may grant relief simply does not apply to the instant case. The 180 day limitation period applies since the tardy filing deprived the Commission of its opportunity to consider the complaint. We disagree.
 
 
 27
 The EEOC's position is that a complaint need not be timely filed under state law before the claimant can benefit from the 300 day federal filing period. 29 C.F.R. § 1601.13(a)(3) (1981). The EEOC's position is entitled to great deference. See Griggs v. Duke Power Co., 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-855, 28 L.Ed.2d 158 (1971). More importantly, the Supreme Court has summarily reversed and remanded two circuit court opinions which held that in deferral states the 300 day filing period was only available where the action had been filed with the state deferral agency within 180 days of the discriminatory act. See Ciccone v. Textron, Inc., 616 F.2d 1216 (1st Cir.1980), vacated, 449 U.S. 914, 101 S.Ct. 311, 66 L.Ed.2d 143 (1980), on remand, 651 F.2d 1 (1st Cir.1981), cert. denied, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 420 (1981); Ewald v. Great Atlantic and Pacific Tea Co., 620 F.2d 1183 (6th Cir.1980), vacated, 449 U.S. 914, 101 S.Ct. 311, 66 L.Ed.2d 143 (1980), on remand, 644 F.2d 884 (6th Cir.1981).
 
 
 28
 We agree with the Third Circuit's opinion in Davis v. Calgon Corporation, 627 F.2d 674 (3d Cir.1980), cert. denied, 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981). In Davis, the plaintiff filed a complaint with the state fair employment agency 213 days after the discriminatory discharge. Ten days later he filed a charge with the Secretary of Labor. Although the district court was located in a referral state, it found that the 300-day filing period was not available to the plaintiff. The district court held the filing with the state agency was untimely and applied the 180-day filing period. The Third Circuit reversed, holding that a plaintiff in a deferral state is entitled to the 300-day filing period whether or not the state filing occurred within the state limitations period or within 180 days after the act of discrimination. Id., 627 F.2d at 657, 677. Accord Jones v. AIRCO Carbide Chemical Co., 691 F.2d 1200 (6th Cir.1982); Aronsen v. Crown Zellerbach, 662 F.2d 584, 587 (9th Cir.1981); Goodman v. Heublein, Inc., 645 F.2d 127 (2d Cir.1981); Ciccone, 616 F.2d at 1220; Morrison v. United Parcel Service, 515 F.Supp. 1317, 1319-20 (W.D.Okl.1981). Accordingly, we hold that deferral state claimants are not required to make a timely filing with the state agency before the federal 300 day filing period applies. All that is required is that a filing with the state agency be made with sufficient time to allow an effective filing with the EEOC within 300 days after the discriminatory act. Jones, 691 F.2d at 1202-1204.
 
 
 29
 MDMH also contends that the present action is untimely because it was not filed with the EEOC within 300 days after Rasimas' termination on July 15, 1975. MDMH admits that Rasimas initiated complaints at the EEOC and the Michigan Civil Rights Commission March 16, 1975, 244 days after he was terminated. MDMH maintains, however, that March 16 cannot be treated as the date the charge was formally "filed" with the EEOC according to Mohasco Corp., 447 U.S. at 812, 100 S.Ct. at 2490. In Mohasco, the Court interpreted 42 U.S.C. § 2000e-5(c) to preclude charges being filed with the EEOC in deferral states until 60 days after the state fair employment agency has received notice of the allegations. 447 U.S. at 815-23, 100 S.Ct. at 2492-95. Therefore, MDMH asserts the present action was not formally "filed" with the EEOC until four days after the 300 day filing period had expired. We disagree.
 
 
 30
 In Wiltshire v. Standard Oil of California, 652 F.2d 837 (9th Cir.1981), cert. denied, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 153 (1982), the Ninth Circuit exhaustively examined Mohasco and determined that it should not be applied to claims which were pending on the date the Supreme Court decision was announced. Wiltshire, 652 F.2d at 842. The Sixth Circuit has on two occasions approved Wiltshire's holding. First, Hall v. Ledex, Inc., 669 F.2d 397, 399 (6th Cir.1982) analyzed Mohasco and endorsed the well-reasoned Wiltshire opinion: "We agree with the Ninth Circuit that Mohasco should not be applied retroactively. Wiltshire v. Standard Oil, 652 F.2d 837 (9th Cir.1981)." In Jones, this Court noted the Hall opinion and its approval of Wiltshire. Jones, 691 F.2d at 1202 n. 3. The present action was filed in 1976, several years before Mohasco was announced. Therefore, applying the precedents of Hall, Jones, and Wiltshire, we hold the present action was timely filed with the EEOC.
 
 III.
 The Finding of Discrimination:
 
 31
 MDMH argues that the district court's finding of sex discrimination is clearly erroneous. MDMH asserts that Rasimas did not establish a prima facie case and the district court took certain comments Nagy made out of context. We disagree. The Supreme Court has explained that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court described an appropriate model for establishing a prima facie case of discrimination:
 
 
 32
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 33
 411 U.S. at 802, 93 S.Ct. at 1824.
 
 
 34
 In the present case, Rasimas presented undisputed evidence which demonstrated his female subordinates were hostile and uncooperative. Moreover, his immediate supervisor referred to him in a sexually derogatory manner.[11] Standard procedures apparently were not followed in counseling him, and his female supervisors recommended his discharge without seriously considering his version of the events which transpired during the Belle Isle outing. We hold that this showing was more than adequate to "give rise to an inference of unlawful discrimination." See Burdine, 450 U.S. at 253, 101 S.Ct. at 1094.
 
 
 35
 MDMH also contends the statement: "The girls are out to get you," was taken out of context. Allegedly, the statement was merely an indication that Rasimas' female subordinates would be hostile toward any person in his position. Our examination of the record indicates that the district court's findings are amply supported. The district court was extremely sensitive to the context in which Swietec and Nagy commented on the staff's reaction to Rasimas. The court found that Swietec believed the staff's reaction was unrelated to Rasimas' sex. The court, however, heard similar testimony from Nagy and determined that the statement "the girls are out to get you" could be accepted without qualification. The district court, as trier of fact, need not credit a witness' explanation for making a particular statement. See, e.g., Mabin v. Lear Siegler, Inc., 457 F.2d 806, 806-07 (6th Cir.1972) (per curiam). Moreover, the district court's finding concerning the July 1, 1975 memo related to beliefs Nagy and Swietec held on July 1, 1975. It is not a blanket statement that Swietec and Nagy ultimately believed there were not sufficient grounds to terminate the plaintiff. Finally, there is ample evidence from which the district court could conclude that MDMH's assertion that Rasimas was fired for poor work performance was merely a pretext. Rasimas was hired and fired within two months even though his female supervisors knew his first several months would be a learning experience and his female staff was hostile and uncooperative.
 
 IV.
 Mitigation of Damages:
 
 36
 The duty to mitigate damages after discrimination has occurred is statutorily imposed by Section 706(g) of Title VII. See 42 U.S.C. § 2000e-5(g). Section 706(g) states in pertinent part: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." This duty has ancient origins, and operates to prevent claimants from recovering for damages which they could have avoided through reasonable diligence. See Ford Motor Co. v. Equal Employment Opportunity Commission, --- U.S. ----, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982), on remand, 688 F.2d 951 (4th Cir.1982).
 
 
 37
 The finding that a claimant has exercised reasonable diligence in seeking other suitable employment following a discriminatory discharge is an issue of fact which, on appeal, is subject to the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). See, e.g., Marks v. Prattco, Inc., 633 F.2d 1122, 1125 (5th Cir.1981) (per curiam); Equal Employment Opportunity Commission v. Sandia Corp., 639 F.2d 600, 627 (10th Cir.1980). Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. See, e.g., NLRB v. Reynolds, 399 F.2d 668, 669 (6th Cir.1968); McCann Steel Co. v. NLRB, 570 F.2d 652, 655 n. 4 (6th Cir.1978); Marks, 633 F.2d at 1125; Sandia Corp., 639 F.2d at 627; Taylor v. Philips Industries, Inc., 593 F.2d 783, 787 (7th Cir.1979); Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir.1978); Equal Employment Opportunity Commission v. Lee Way Motor Freight, Inc., 625 F.2d 918, 937 (10th Cir.1979); Sangster v. United Airlines, Inc., 633 F.2d 864, 868 (9th Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). The Defendant may satisfy his burden only if he establishes that: 1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions. Sias, 588 F.2d at 696; Sandia, 639 F.2d at 627.
 
 A. Substantial Equivalent Employment
 
 38
 In Rutherford v. American Bank of Commerce, 12 Fair Empl.Prac.Cas. (BNA), 1184 (D.N.M.1976), aff'd, 565 F.2d 1162 (10th Cir.1977), the plaintiff, a loan officer trainee with over six years experience, resigned over a dispute concerning her job duties. Plaintiff filed a sex discrimination charge with the EEOC and began searching for other substantially equivalent employment. During her search, Fidelity Bank offered her a job as a "float." Plaintiff refused. American Bank of Commerce, the defendant, argued that plaintiff had failed to mitigate her damages. The court disagreed:
 
 
 39
 [American Bank of Commerce] argues that Rutherford failed to mitigate damages. There is no support for this contention. Her refusal of an offer by Fidelity Bank as a "float" because it took no account of her years of experience and offered only remote possibilities for comparable advancement, does not aid ABC's theory. Nor does ABC suggest any reason why Rutherford should be required to accept inferior employment. In the area of employment contracts comparability of status has been deemed more important in some situations than comparability of salary, for example in the context of mitigation. See Williams v. Albemarle City Bd. of Education, 508 F.2d 1242 (4th Cir.1974). Failure of plaintiff to seek reemployment with ABC also does not bar recovery.
 
 
 40
 12 Fair Empl.Prac.Cas. at 1190.
 
 
 41
 We hold that the substantial equivalent of the position from which the claimant was discriminatorily terminated must afford the claimant virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. See Ford Motor Co., 102 S.Ct. at 3065 ("Although the un- or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied."); McCann Steel Co. v. NLRB, 570 F.2d 652, 655 (6th Cir.1978) ("We believe that substantially equivalent employment refers to the hours worked ... as well as the nature of the work there."); Stone v. D.A. & S. Oil Well Servicing, Inc., 624 F.2d 142, 144 (10th Cir.1980); Williams v. Albemarle City Board of Education, 508 F.2d 1242, 1243 (4th Cir.1974) (en banc ); Ballard v. El Dorado Tire Co., 512 F.2d 901, 906 (5th Cir.1975).
 
 B. Reasonable Diligence
 
 42
 A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation. See, e.g., Lee Way Motor Freight, 625 F.2d at 938; Sandia Corp., 639 F.2d at 627; NLRB v. Pilot Freight Carriers, Inc., 604 F.2d 375, 377 (5th Cir.1979). The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual characteristics of the claimant and the job market. See Stone, 624 F.2d at 144 (Reasonable diligence shown where job seeker voluntarily left non-comparable part-time employment to seek substantially equivalent work in another location); Falls Stamping & Welding Co. v. International Union United Automobile, Aircraft and Agricultural Workers of America, 667 F.2d 1026 (6th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 136 (1982) (Older claimants need not exert as much effort as young claimants).
 
 
 43
 In the present case, the district court recognized that the defendant had the burden of demonstrating Rasimas' conduct was so unreasonable as to constitute a failure to mitigate damages. MDMH attempted to meet its burden by showing that Rasimas had, on at least two occasions, rejected substantially equivalent positions.
 
 
 44
 First, on April 20, 1976, Rasimas was sent a form letter asking him to interview for a recreation aide position. The letter, however, did not inform him of his right of first refusal with respect to the position. MDMH argues that Rasimas' refusal to interview should toll the accrual of backpay and constitute a willful failure to mitigate damages. We disagree.
 
 
 45
 In Ford Motor Co., the Supreme Court summarized the mitigation of damages rule where the employer offered the claimant a position as follows:
 
 
 46
 An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g)." This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the un- or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied. Consequently, an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages. An employer's unconditional offer of the job originally sought to an un- or underemployed claimant, moreover, need not be supplemented by an offer of retroactive seniority to be effective ....
 
 
 47
 102 S.Ct. 3065.
 
 
 48
 In the present case, it can hardly be disputed that the recreation aide position is not the substantial equivalent of the supervisor 10 position. The responsibilities as an activities aide in implementing recreational programs for the resident-patients with multiple handicaps are obviously not co-extensive with those of the supervisor 10 to whom he reports. In fact, it is clear that the request to interview was little more than an attempt to get Rasimas to accept a demotion. Moreover, the interview letter was neither "unconditional" nor "an offer of employment." See Stone, 624 F.2d at 144. An invitation to interview is, at best, a job offer which is contingent upon the applicant having the best qualifications. Moreover, Rasimas was never informed that he had the right of first refusal with respect to the recreation aide's position.
 
 
 49
 Second, on November 9, 1979, Rasimas was offered an opportunity to interview for a position as Assistant Rights Advisor at the Alpine Regional Center in Gaylord, Michigan. He declined to interview for the position. MDMH argued before the district court that this conduct constituted a willful failure to mitigate damages. The district court held that Rasimas could, consistent with his duty to mitigate damages, refuse to interview for a position 223 miles from his home in Warren, Michigan. We agree.
 
 
 50
 It is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where he refused to accept employment that is an unreasonable distance from his residence. In Oman Construction Co., Inc., 144 NLRB Dec. (CCH) 1534 (1963), enf'd., 338 F.2d 125 (6th Cir.1964), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965), the discriminatorily discharged employee refused to accept a job more than 200 miles from his home in Nashville. This Court enforced the National Labor Relations Board order which held that the employee's refusal did not constitute a failure to mitigate damages. Similarly in NLRB v. Madison Courier, Inc., 472 F.2d 1307 (D.C.Cir.1972), the court held that the duty to make reasonable efforts to find employment did not obligate claimants "to seek work in Louisville or other areas located over 50 miles from Madison, due to the excessive commute such jobs would have entailed." Id. at 1314. See, e.g., Florence Printing Co. v. NLRB, 376 F.2d 216, 221 (4th Cir.1967), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); Jackson v. Wheatley School Dist., 464 F.2d 411, 413-14 (8th Cir.1972); Wells v. Hutchinson, 499 F.Supp. 174, 205 (E.D.Tex.1980).
 
 V.
 
 51
 Accordingly, we affirm the sex discrimination finding, but reverse the timeliness and mitigation of damages determinations. We commend the district court for its careful and sensitive treatment of the facts. Detailed findings of fact do much to enhance the quality of appellate review. The district court never fully addressed the backpay issue due to its rulings on other issues. Therefore, this action is remanded to the district court for further proceedings consistent with this opinion. On remand the court should award backpay in accordance with the following guidelines.
 
 
 52
 A backpay award should make the claimant whole, that is, to place him in the position he would have been in but for discrimination. In Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court held:
 
 
 53
 [G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered for past discrimination.
 
 
 54
 Id. at 421, 95 S.Ct. at 2373. Thus, in the absence of exceptional circumstances, backpay should always be awarded when a Title VII violation is found. See, e.g., Los Angeles Department of Water & Power v. Manhart, 435 U.S. 702, 719, 98 S.Ct. 1370, 1380-1381, 55 L.Ed.2d 657 (1978); Head v. Timken Roller Bearing Co., 486 F.2d 870, 876 (6th Cir.1973); Meadows v. Ford Motor Co., 510 F.2d 939, 945 (6th Cir.1975); Stewart v. General Motors Corp., 542 F.2d 445, 451 (7th Cir.1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Kirby v. Colony Furniture Co., Inc., 613 F.2d 696, 699 (8th Cir.1980). The special factors which would constitute exceptional circumstances and prevent backpay awards are exceedingly rare.[12] See Albemarle Paper Co., 422 U.S. at 417, 95 S.Ct. at 2371; Meadows, 510 F.2d at 942; Stewart, 542 F.2d at 451; Kirby, 613 F.2d at 699. Neither the arguable good faith of the defendant employer nor the difficulty in calculating the backpay award constitute exceptional circumstances. See, e.g., Head, 486 F.2d at 877; Stewart, 542 F.2d at 451; Kirby, 613 F.2d at 699; Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 253-54, 260 (5th Cir.1974).
 
 
 55
 Backpay awards should completely redress the economic injury the claimant has suffered as a result of discrimination. A claimant, therefore, should receive the salary, including any raises, which he would have received but for discrimination. See Satty v. Nashville Gas Co., 522 F.2d 850, 855 (6th Cir.1975), aff'd in part and vacated in part, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); Anderson v. Methodist-Evangelical Hospital, Inc., 464 F.2d 723 (6th Cir.1972); Paxton v. Union National Bank, 29 Fair Empl.Prac.Cas. (BNA) 1233, 1252 (8th Cir.1982); Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc., 559 F.2d 1203 (2d Cir.1977), cert. denied, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Sick leave, vacation pay, pension benefits and other fringe benefits the claimant would have received but for discrimination should also be awarded. See Meadows, 510 F.2d at 948; Satty, 522 F.2d at 855; Farmer v. Hotel Workers, Local 1064, 21 Fair Empl.Prac.Cas. (BNA) 1599 (E.D.Mich.1978), aff'd in part and rev'd in part sub. nom. Farmer v. ARA Services, Inc., 660 F.2d 1096 (6th Cir.1981); Culp v. General American Transportation Corp., 517 F.2d 1404 (6th Cir.1975); Laugensen v. Anaconda Co., 510 F.2d 307, 317 (6th Cir.1975); Paxton, 29 Fair Empl.Prac.Cas. (BNA) at 1252; Pettway, 494 F.2d at 263; Bowe v. Colgate, Palmolive Co., 489 F.2d at 903-04 (7th Cir.1973); Sandia, 639 F.2d at 626; Ingram v. Madison Square Garden Ctr. Inc., 482 F.Supp. 918, 926 (S.D.N.Y.1979); Willett v. Emory and Henry College, 569 F.2d 212 (4th Cir.1978). Backpay awards should not be reduced by the amount of income and social security taxes which would have been deducted from the wages the claimant would have received but for discrimination. See Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir.1980).
 
 
 56
 Unemployment benefits also should not be deducted from backpay awards. This Circuit has on several previous occasions affirmed district courts which have held that unemployment benefits should not be offset against backpay awards.[13] See Falls Stamping & Welding Co. v. International Union United Automobile, Aircraft and Agricultural Workers of America, 667 F.2d 1026 (6th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 136 (1982); Mabin v. Lear Siegler, Inc., 4 Fair Empl.Prac.Cas. (BNA) 679, 687 (W.D.Mich.1971), aff'd, 457 F.2d 806 (6th Cir.1972); Oman Construction Co., Inc., 144 NLRB Dec. 1543, 1544 (1963), enf'd, 338 F.2d 125 (6th Cir.1964). But see, Satty, supra. A number of other courts have also refused to reduce backpay awards by the amount of unemployment compensation received by the claimant. See, e.g., Winn-Dixie Stores, Inc. v. NLRB, 413 F.2d 1008, 1009-10 (5th Cir.1969); Isaac and Vinson Security Services, Inc., 208 NLRB Dec. 47 (1973), enf'd, 467 F.2d 213 (5th Cir.1972); International Assoc. of Machinists & Aerospace Workers v. Champion Carriers, Inc., 470 F.2d 744, 745 (10th Cir.1972); Tidwell v. American Oil Co., 332 F.Supp. 424, 437-38 (D.Utah 1971); Abron v. Black & Decker Mfg. Co., 439 F.Supp. 1095, 1115 (D.Md.1977), aff'd in part and vacated in part, 654 F.2d 951 (4th Cir.1981).
 
 
 57
 Backpay should be awarded even where the precise amount of the award cannot be determined. See, e.g., Equal Employment Opportunity Commission v. Detroit Edison Co., 515 F.2d 301, 315 (6th Cir.1975), vacated on other grounds sub. nom. Utility Workers Union v. Equal Employment Opportunity Commission, 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977); Meadows, 510 F.2d at 943; Stewart, 542 F.2d at 452; Pettway, 494 F.2d at 260-61. Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer. See, e.g., Detroit Edison, 515 F.2d at 315; Kaplan v. Theatrical Employees Local 659, 525 F.2d 1354, 1362-63 (9th Cir.1975); Pettway, 494 F.2d at 260-61; Stewart, 542 F.2d at 452; Bowe, 489 F.2d 896, 902; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1380 (5th Cir.1974); Kallir, Philips, Ross, Inc., 420 F.Supp. at 923; NLRB v. Coca-Cola Bottling Co., 360 F.2d 569, 573 (5th Cir.1966); Croushorn v. Board of Trustees of Univ. of Tennessee, 518 F.Supp. 9, 27 n. 16 (M.D.Tenn.1980). In Detroit Edison, this Court held that backpay equal to the maximum amount which could have been earned but for discrimination was appropriate where it was impossible to reconstruct the employment history of each claimant. 515 F.2d at 315.
 
 
 58
 HOFFMAN, Senior District Judge, concurring in part and dissenting in part.
 
 
 59
 I agree with the majority that the judgment[1] entered by the District Court on September 16, 1980, must be vacated and remanded. The reason is that the District Court relied upon the Supreme Court decision in Mohasco Corp. v. Silver, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), an opinion filed not quite three months prior to the judgment entered by the District Court in this case. A later opinion of the Supreme Court, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), held that the statutory filing of charges with the Equal Employment Opportunity Commission (EEOC) was not a jurisdictional prerequisite, but was in the nature of a statute of limitations. Since the District Court never had the opportunity to consider the Zipes case,[2] I would vacate and remand to permit the District Court to make specific findings and conclusions on this phase of the case, together with other matters mentioned herein. At this point my agreement with the majority ends.
 
 In Zipes, the Supreme Court said:
 
 60
 By holding compliance with the filing period to be not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires, we honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer.
 
 
 61
 The majority opinion reverses the District Court and deprives it of the opportunity to consider waiver and tolling. While the ultimate result may be in accordance with the majority's views, this is a function of the District Court and not the appellate court. Of course, if neither Mohasco nor Zipes are to be considered retroactive, then the Sixth Circuit holdings in Hall v. Ledex, Inc., 669 F.2d 397, 399 (6th Cir.1982), and Jones v. AIRCO Carbide Chemical Co., 691 F.2d 1200 (6th Cir.1982)[3] are applicable.
 
 
 62
 In Zipes, the Supreme Court could have readily disposed of the retroactive effect occasioned by any change in the law by simply holding that the charges filed with the EEOC were long prior to Mohasco and hence nonretroactive. The Supreme Court in Zipes did not discuss any issues of retroactivity. I believe that Zipes now compels a finding on waiver and/or tolling to be made by the District Court, although the tolling issue has been specifically decided against the plaintiff by the District Court's findings of fact and conclusions of law (See, Conclusions of Law (2)).
 
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 63
 My concern with the findings of fact and conclusions of law rests with the conclusions of law. The findings are, of course, binding upon this court unless clearly erroneous.
 
 
 64
 Under Conclusion (6) the District Court describes the type of discrimination which existed among the females who worked under plaintiff, and who were under his supervision. The findings do not point the finger of discriminatory practice against the persons who were superior to Rasimas, i.e., Rosen (Director), McDonald (Administrative Officer in charge of personnel), Nagy (a female Director of the Nursing Home program), and Swietec, known as Caron Bender during the pertinent period involved, (a female mental retardation supervisor 10). The most that can be said with respect to plaintiff's superiors is that (1) they paid too much attention to the complaints of the staff working under Rasimas, and (2) before making the final decision to discharge Rasimas, the superiors did not discuss the Belle Isle incident with Rasimas although, as the District Court noted, there are essentially no factual disputes--the differences between Rasimas and his staff were matters of judgment as to whether he should have returned to the Hoover Nursing Home when Donna, the very young child, became ill.[4]
 
 
 65
 In discussing the type of discrimination to which Rasimas was subjected, the District Court had this to say:
 
 
 66
 However, in the case of a white male, not a member of any readily identifiable ethnic minority, common sense may balk at a presumption that adverse treatment of him is the result of an alleged discriminatory motive, even where that treatment is at the hands of the opposite sex, and even where there is no objectively verifiable legitimate motivation. Simply put, the difficulty is this: why should anyone presume that women would treat a man less favorable than another woman? The historical context of discrimination of this sort is not as readily apparent as that of discrimination against Blacks or women.
 
 
 67
 Nonetheless, the Court deems that an inference of sexual discrimination can be drawn from the facts constituting the prima facie case described above. The same sexual role stereotypes that have caused women to be channeled either away from the job marketplace altogether, or into lower-paying jobs than men, necessarily have their counterparts in male sexual role stereotypes. Thus, as women are stereotypically expected to be sexually passive or submissive, men are, according to stereotypes, expected to be aggressive and dominant. Further, as women are stereotypically expected to be less suited to the business world and more suited to domestic roles, similarly men are stereotypically expected to be better in business related roles and less suited for domestic roles. In other words, hypothetically, a woman reacting to a man in a stereotypical manner would be more inclined to view him as insensitive to children than she would viewing another woman in the same circumstances.
 
 
 68
 Based upon the evidence adduced at trial, the Court believes that the plaintiff in this case was victimized by exactly such a stereotypical view.
 
 
 69
 The "stereotypical" theory has not, according to my research, been injected into any theory of intentional discrimination. As this is a disparate treatment case, it is now well-settled that a finding of "intentional discrimination" is necessary to support the ultimate finding of illegal discrimination.
 
 
 70
 As stated in the recent case of United States Postal Service Board of Governors v. Aikens, --- U.S. ----, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), in which the Supreme Court remanded the case to the District Court for further findings because the District Court erroneously focused on the question of the prima facie case rather than on the question of discrimination, I would remand this case to the District Court for further findings as to "discriminatory intent." At no point in the factual findings has the District Court mentioned "discriminatory intent."[5] In Aikens, the Supreme Court was careful to note that once the trial court had determined that a prima facie case had been established, the McDonnell-Burdine presumption "drops from the case" and "the factual inquiry proceeds to a new level of specificity". Likewise, in Aikens, the Supreme Court reiterates its previous rulings that the factual inquiry in a Title VII case is "whether the defendant intentionally[6] discriminated against the plaintiff", citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Other than by inference derived from the legal conclusion of the District Court, I find no suggestion of intentional discrimination, especially with respect to the superiors of Rasimas who had the authority to hire and fire.[7]
 
 
 71
 For these reasons, and in accord with the principles set forth in Aiken, supra, I would remand this case to the District Court for additional findings as to the existence of intentional discrimination and with whom such intent existed. I have grave doubts as to whether such intent, if it existed, is chargeable to the supervisors of Rasimas who had the authority to recommend his discharge to McDonald, the Administrative Officer in charge of personnel. The discharge action may have been neither discriminatory nor praiseworthy. The action may have been the result of poor employee relations, but nevertheless not constitute discriminatory treatment.[8] Similarly, I entertain a doubt that an employer is required to interview an employee charged with poor judgment in an isolated incident (the Belle Isle's trip) where the facts are not in substantial disagreement, and that such failure to interview Rasimas in this case is any indication of discriminatory intent,[9] either with respect to one on probationary status as was Rasimas or as to any permanent employee.
 
 MITIGATION OF DAMAGES
 
 72
 I agree with the majority that the actions of Rasimas, in declining to be interviewed in response to the letter of April 20, 1976 requesting same, should not, standing alone, diminish the damages to which Rasimas would be entitled, if he is entitled to any damages in this action. Assuming arguendo that the sole reason found by the District Court for mitigating the damages is predicated upon the actions of Rasimas in declining to be interviewed, this was error. However, on remand if it were possible under the majority opinion to consider findings on mitigation, I think that it would be permissible for the District Court to consider the age factor (Rasimas was 34 when he was discharged, and 39 at the time of trial in 1980); the fact that he had applied for comparable employment in Chicago (trial testimony), San Francisco (deposition testimony), and other locations not immediately in the area he lived; that he was unmarried, his family status, and why he could not accept employment in other areas; along with other related factors.
 
 
 73
 As the Supreme Court said in Ford Motor Company v. Equal Employment Opportunity Commission, --- U.S. ----, ----, 102 S.Ct. 3057, 3063, 73 L.Ed.2d 721 (1982),Under § 706(g), then, "backpay is not an automatic or mandatory remedy[.] ... it is one which the courts 'may' invoke" in the exercise of their "discretion [which] is equitable in nature."
 
 
 74
 Citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 415, 416, 95 S.Ct. 2362, 2370, 2371 (1975).
 
 
 75
 While this case is being remanded to the District Court to determine damages, the majority opinion is written in such a manner as constituting a direction for the District Court to award full backpay, at least to the date of the District Court's opinion rendered in September, 1980--an award then in excess of $81,000.
 
 UNEMPLOYMENT INSURANCE
 
 76
 The majority adopts a rule established by the majority opinion in E.E.O.C. v. Ford Motor Co., 645 F.2d 183, 195-196 (4th Cir.), rev'd on other grounds, --- U.S. ----, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), thus making it mandatory on all district judges in the circuit to disregard the receipt of employment benefits in computing damages in discrimination cases. The District Court, in the present case, made no findings on this issue as it found for MDMH because of the time limitations. For the reasons expressed in my dissenting opinion in E.E.O.C. v. Ford Motor Co., 645 F.2d at 200, 210 (4th Cir.1981), I feel that the Supreme Court, in N.L.R.B. v. Gullett Gin Co., 340 U.S. 361, 364, 71 S.Ct. 337, 339-340, 95 L.Ed. 337 (1951), has held that this issue should be left solely to the discretion of the District Court.
 
 
 77
 It may be argued that in Ford Motor Co. v. E.E.O.C., supra, the Supreme Court did not discuss this issue and, therefore, tacitly approved the ruling of the Fourth Circuit majority. The fact is that any such ruling by the Supreme Court was wholly unnecessary to the decision in that case as the two women involved who had received unemployment insurance were cut off from any backpay long prior to the receipt of unemployment benefits in accordance with the Supreme Court's ruling that they were required to accept an unconditional offer of employment to an equivalent position.
 
 
 78
 More significantly, the ruling of the majority in this case will create a conflict in the Sixth Circuit. In Satty v. Nashville Gas Company, 522 F.2d 850, 855 (1975), vacated and remanded on other grounds, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), a panel of this court upheld the action of a District Court in reducing a discrimination award by the receipt of unemployment insurance. Thus, the majority in the instant case is changing the discretionary rule vested in district judges contrary to the Supreme Court in Gullett Gin Co. and the Sixth Circuit in Satty.
 
 
 79
 For the foregoing reasons, and with great respect, I am obliged to concur in part and dissent in part.
 
 
 
 *
 Hon. Walter E. Hoffman, Senior Judge, Eastern District of Virginia, sitting by designation
 
 
 [1]
 Prior to being hired by the Michigan Department of Mental Health, David Rasimas had served in the Army as a medical corpsman and an operating room technician from 1960 to 1963. Rasimas worked as an operating room technician, surgical assistant, intraveneous technician, an inhalation therapist, and an emergency technician after leaving the Army. In 1972, Shaw College awarded him a bachelor's degree in psychology
 
 
 [2]
 Caron Bender Swietec was David Rasimas' immediate supervisor although she held the same position, Mental Retardation Program Supervisor 10, as he. The district court's opinion spells Caron Swietec's last name S-W-I-E-T-E-C. The transcript, however, spells her last name S-W-I-A-T-E-K. We have used the spelling contained in the district court's opinion
 
 
 [3]
 Hoover Nursing Home is a private care facility for patients who are mentally and physically handicapped. The staff is under the joint control of the Director of Nursing for Hoover Nursing Home and a Mental Retardation Supervisor 10 from the Macomb Oakland Regional Center
 
 
 [4]
 It is not clear whether the graffiti was the product of staff members or resident patients
 
 
 [5]
 Deborah LaFrate, activities aide 05 on probationary status with less than six months experience, reacted emotionally when Rasimas questioned her about techniques she had recently been taught by Rasimas' predecessor. LaFrate's prior work experience had been in a clothing store
 Marilyn Whitmer, a recreation activities aide 05 under Rasimas' supervision, testified as follows under cross examination:
 Q I'm asking you that if Mr. Rasimas came down with a policy and you did not know whether it was an MORC policy, you wouldn't have followed it, is that right? Is that what you are telling us?
 A Well, if I felt it was not an MORC policy, if it was something he was trying to get us to follow and it wasn't what we should be following, no, I would not have followed it.
 
 
 [6]
 At no time did LaFrate examine the child to determine if her vital organs were functioning abnormally. LaFrate did not have an extensive medical background. In fact, she testified that she had received a little on-the-job medical training from the nursing staff at Hoover Nursing Home
 
 
 [7]
 The Michigan Department of Civil Rights is a deferral agency. See 29 C.F.R. § 1601.74
 
 
 [8]
 In 1980, Rasimas passed the emergency medical service examination. Subsequently, he was placed on the register to become a paramedic in Detroit
 
 
 [9]
 42 U.S.C. § 2000e-5(e) states:
 (e) Time for filing charges. A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.
 
 
 [10]
 42 U.S.C. § 2000e-5(c) states:
 (c) State or local proceedings. In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a)[ (b) ] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.
 
 
 [11]
 Caron Swiatek admitted that she had called Rasimas a "male chauvinist" on at least one occasion
 
 
 [12]
 If a district court should decline to award backpay, it should carefully articulate its reasons for selecting that course of action. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 n. 14, 95 S.Ct. 2362, 2373 n. 14, 45 L.Ed.2d 280 (1975)
 
 
 [13]
 As we understand our brother, Judge Hoffman, he personally would not deduct unemployment compensation from backpay awards. However, he feels constrained by National Labor Relations Board v. Gullet Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951) to hold that the district court should have discretion in determining when to deduct unemployment compensation from a backpay award. Infra at 632
 We disagree. Title VII is intended to establish a national backpay policy. That policy is to make "persons whole for injuries suffered from past discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). It is inconsistent with this national policy to argue, as my brother implicitly has, that two identically situated claimants may be made "whole" by radically different backpay awards. To allow district courts to determine just how "whole" a claimant will be is antagonistic to the establishment of a uniform national policy.
 Second, disallowing the deduction does not have a detrimental effect on a claimant's incentive to use "reasonable diligence" to find substantially equivalent employment. Moreover, if Congress did not intend for an employee to receive unemployment benefits in addition to back pay, the logical solution is a recoupment of the benefits by the state employment agency. In fact, in Michigan such a recoupment procedure already appears to exist. See MCLA § 421.62.
 Finally, our brother appears to have overlooked the significance of the reasoning in Gullett Gin. There the Supreme Court explicitly rejected the rationale for deducting the unemployment compensation from backpay awards. The rationale is summarized as follows:
 1) where the contributions to the fund from which the benefits derive are made solely by the defendant, the collateral source rule does not apply; 2) the plaintiff would otherwise receive a double recovery; and 3) the defendant would otherwise in effect be subject to punitive damages. See Equal Employment Opportunity Commission v. Enterprise Association Steamfitters Local 638, 542 F.2d 579, 591-92 (2d Cir.1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1976). The Supreme Court rejected these arguments, stating:
 To decline to deduct state unemployment compensation benefits in computing backpay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.
 But respondent argues that the benefits paid from the Louisiana Unemployment Compensation Fund were not collateral but direct benefits. With this theory we are unable to agree. Payments of unemployment compensation were not made to the employees by taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state [citations omitted]. We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than "whole" as that phrase has been understood and applied.
 Gullett Gin Co., 340 U.S. at 364, 71 S.Ct. at 339-340.
 
 
 [1]
 The judgment was in favor of the Michigan Department of Mental Health (MDMH). The judgment reads:
 "For the reasons set forth in the Memorandum Opinion and Order issued this date:
 IT IS ORDERED AND ADJUDGED that the plaintiffs (sic) take nothing, and that the action be dismissed on the merits. Each party is to pay its own costs of action."
 The judgment was entered pursuant to a motion to dismiss filed by MDMH a few days prior to the scheduled trial date. After hearing argument on the motion, the District Court reserved its ruling and decided to proceed with the trial as the witnesses were then available. Whether treated as a motion to dismiss or a motion for summary judgment, it is apparent that the final ruling in favor of the defendant was due to the jurisdictional question presented.
 
 
 [2]
 I agree that this Circuit had previously ruled in accordance with Zipes that the filing requirement was, like a statute of limitations, subject to waiver, estoppel and equitable tolling. See: Leake v. Cincinnati, 605 F.2d 255 (6th Cir.1979). The District Court did, however, make an express conclusion of law that "plaintiff has alleged no facts which would justify the tolling of the 300-day period on equitable grounds," citing the Leake case and Fox v. Eaton Corp., 615 F.2d 716 (6th Cir.1980). Since "equitable tolling" requires reasonable reliance upon defendant's conduct or representations, Lawson v. Burlington Industries, Inc., 683 F.2d 862, 864 (4th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982), it would appear that the District Court is correct as to this legal conclusion. Nevertheless, the District Court may wish to review its conclusions on this issue by reason of Zipes
 
 
 [3]
 Jones v. AIRCO did not rule upon the retroactive effect of Mohasco as the filing with the EEOC was subsequent to Mohasco. See: 669 F.2d at 399, footnote 3
 
 
 [4]
 The prior experience of Rasimas dealing with young children was at Northville where the children were young adults. The Hoover Nursing Home accepted much younger children, all of whom were under 16 years of age. Understandably, a child age 5 or thereabouts must be accorded different treatment than that accorded an 18 year old
 
 
 [5]
 I fully recognize that the second portion of 42 U.S.C. § 1985(2) provides: "[O]r if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of laws, or to injure him or his property for unlawfully, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws", provides an actionable basis for a suit predicated upon the private employment of "equal protection of the laws" and "equal privilege and immunities under the laws", but the District Court made no express finding that any conspiracy existed between the females who were working under Rasimas and the females who were his supervisors; nor did the amended complaint allege this issue. Kush v. Rutledge, --- U.S. ----, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983)
 
 
 [6]
 I concede that direct evidence of discriminatory intent is not required. The evidence may be direct or circumstantial. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977); Aiken, supra, n. 3
 
 
 [7]
 In Board of Trustees v. Sweeney, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), the Supreme Court had the occasion to distinguish between the employer's duty to "articulate some legitimate, nondiscriminatory reason for the employee's rejection" and "proving absence of discriminatory motive". In remanding Sweeney, the Supreme Court held that only articulation was required of the employer and, because the Court of Appeals had imposed a heavier burden on the employer, the case was remanded for reconsideration. The same situation exists in this case
 
 
 [8]
 See: Smith, Employer Defenses in Employment Discrimination Litigation: A Reassessment of Burdens of Proof and Substantive Standards Following Texas Department of Community Affairs v. Burdine, 55 Temple U.L.R. 372, at 379
 
 
 [9]
 Not mentioned in the findings and conclusions, nor in the majority opinion, is an incident pertaining to the safety and well-being of the children--obviously a primary factor as to all aides and supervisors in the operation of a nursing home for mentally retarded and physically handicapped children of a young age--which incident occurred on June 14, 1975, well before the Belle Isle trip on July 12, 1975. The staff supervised by Rasimas, along with other concerned aides, signed a report of the incident which essentially alleges that Rasimas grabbed the back of a child's pants, the child fell to the floor crying and, after he was picked up and was returning to the East wing, Rasimas grabbed the child's leg and began to pull on it, thus causing the child to scream louder. While Rasimas did not testify at trial as to the specifics of this incident, his discovery deposition taken on May 28, 1980 (included in the record on appeal) gives this explanation (p. 49) "I recall--if I recall correctly, that was the incident involving a young resident, young black male resident, who I used to play around with, I liked him, and the incident occurred on the corner of one of the nursing stations. I came up from behind him and tickled him in the side, and then moved around him the other direction quickly so he wouldn't see me, and the little--the child, he was maybe eight or ten, turned to see who it was, and he lost his balance, and he slipped on the floor onto his butt. There were two nurses aids (sic) standing on the nurses station that saw this, and they jumped up and said: 'You shouldn't do that to him'. I didn't do anything to him, and why 13 signed it, I don't know, because only one or two were there."
 While this incident, even assuming the truth of Rasimas' statement under oath, may not have justified any discharge at that time, his admitted act constituted, in my opinion, poor judgment in dealing with the safety and well-being of a young, mentally retarded, physically handicapped child.