**Robin C. OLDFATHER, Plaintiff,**

v.

**The OHIO DEPARTMENT OF TRANSPORTATION, et al.,**
**Defendants.**

**No. C–3–84–709.**

United States District Court,
S.D. Ohio, W.D.

Sept. 30, 1986.

Kathryn A. Lamme, Dayton, Ohio, for plaintiff.

Michael H. Igoe, Asst. Atty. Gen. Chief, Transp. Section, Michael A. Esposito, Asst. Atty. Gen. Transp. Section, Ohio Dept. of Transp., Amy R. Goldstein, Asst. Atty. Gen., Transp. Section, Columbus, Ohio, for defendants.

RICE, District Judge.

OPINION; FINDINGS OF FACT AND CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT OHIO DEPARTMENT OF TRANSPORTATION ON FIRST CLAIM FOR RELIEF; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANTS SMITH AND TIPTON AS TO CLAIM AGAINST THOSE DEFENDANTS ON SECOND CLAIM FOR RELIEF; JUDGMENT TO BE ENTERED FOR DEFENDANTS TRAVIS AND WALLACE AND AGAINST PLAINTIFF ON REMAINING PORTIONS OF SECOND CLAIM FOR RELIEF; JUDGMENT TO BE ENTERED FOR DEFENDANTS AND AGAINST PLAINTIFF ON THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF; TELEPHONE CONFERENCE SET

The captioned cause came on to be heard by the Court sitting as the trier of fact, a jury having been waived by the parties upon those issues triable to a jury (the second, third and fourth claims for relief set forth in the Plaintiff's Complaint), upon the pleadings, the testimony of the parties and their witnesses, and the arguments and post trial memoranda of counsel.

Upon due consideration of the evidence adduced at trial and the law applicable thereto, it is the opinion of the Court that the Plaintiff has sustained her burden of proof by the requisite preponderance of the evidence on her first claim for relief alleging the discrimination by the Ohio Department of Transportation (ODOT) on the basis of her sex in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et*

*seq.,* and on her second claim for relief alleging a violation by the individual Defendants, Smith and Tipton, acting under color of state law, of her constitutional right to equal protection of the laws, in violation of 42 U.S.C. § 1983. Accordingly, judgment will be entered, in the manner and to the extent as more fully set forth below, in favor of the Plaintiff and against the appropriate Defendants on these claims.

Ruling further, it is the opinion of the Court that the Plaintiff has *not* sustained her burden of proof, by the required preponderance of the evidence, on the remaining three claims, to wit: a state law claim against the individual Defendants for intentional and negligent infliction of emotional distress and for damaging her reputation in the community (third claim for relief), a claim against the individual Defendants based upon the discriminatory refusal to rehire Plaintiff into the job from which she had been discharged when that job was available, the Defendants having hired a male employee instead of Plaintiff in violation of her constitutional rights, a claim presumably made pursuant to 42 U.S.C. § 1983 (fourth claim for relief), and a claim against ODOT for discrimination on the basis of her sex and in retaliation for her earlier filing of a charge of sex discrimination with the Ohio Civil Rights Commission, said claim filed pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* Accordingly, judgment will enter in favor of the appropriate Defendants and against the Plaintiff on these latter three claims.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Court sets forth its Findings of Fact separately from its Conclusions of Law:

## I. FINDINGS OF FACT

A. UNCONTROVERTED FACTS—The following facts have been stipulated to by and between the parties as uncontroverted (Final Pretrial Order, Doc. # 45, pp. 4–7):

(1) Plaintiff Robin Oldfather worked for Defendant Ohio Department of Transportation from April 4, 1983, through September 17, 1983.

(2) Plaintiff's employment status was an O.A. (over-authorized) Project Inspector Supervisor. This was a cross-payrolled position, as Plaintiff did not perform the duties of that position but rather functioned as an assistant to Defendant Robert Travis.

(3) Plaintiff received two performance evaluations while employed at ODOT.

(4) Defendant Ohio Department of Transportation (ODOT) is a department of the State of Ohio created pursuant to Title 55 of the Ohio Revised Code.

(5) ODOT has for organizational purposes divided the State of Ohio into 12 geographic districts.

(6) Defendant Robert Travis held the position of Administrative Assistant (AA) for ODOT District 8 from February, 1983, to the time of trial. District 8 is composed of the counties of Preble, Montgomery, Greene, Butler, Warren, Clinton, Hamilton, and Clermont. District 8 is headquartered in Lebanon, Warren County, Ohio.

(7) Defendant Travis as the district AA served as the second in command to the District Deputy Director relative to the day-to-day operation of District 8.

(8) Defendant Lloyd Wallace was the Deputy Director of ODOT District 8 from August 17, 1983, to the date of trial. He manages the operation of ODOT District 8.

(9) The following other persons held the position of District 8 Deputy Director during 1983 prior to Defendant Wallace: Donald Carpenter, Raymond Keller, and Steven Petty.

(10) Defendant Morris L. Tipton is Deputy Director of Administration for ODOT. He held this position from January, 1983, to the date of trial. He oversees the Bureaus of Personnel, Purchasing, Administrative Support, and Administrative Services. Defendant Tipton's office is located at the ODOT central office in Columbus.

(11) Defendant Warren J. Smith, Director of ODOT, is a state cabinet member and chief executive officer of the Ohio De-

partment of Transportation. He has held this position from January, 1983 to the present.

(12) Plaintiff Oldfather and Defendant Travis were involved in a sexual relationship that began in May, 1981, and continued through May, 1984.

(13) Shortly after Plaintiff began working in District 8, she became aware that there was talk in the community concerning her relationship with Defendant Travis.

(14) In July of 1983, talk of this affair was brought to the attention of Defendants Smith and Tipton from the Assistant Director of ODOT, Bernard B. Hurst. Mr. Hurst had heard talk about the alleged relationship between Mrs. Oldfather and Mr. Travis while attending a Cincinnati Reds baseball game on July 9, 1983.

(15) On July 12, 1983, a meeting was held in Columbus with Defendants Smith, Tipton, and Travis present. The discussion centered around reports Smith and Tipton had received regarding Travis' relationship with Plaintiff Oldfather.

(16) On July 19, 1983, Defendant Smith, while in Washington D.C., received a telephone report from a source outside of ODOT, concerning an alleged slapping scene at the District 8 office involving Mrs. Travis, Defendant Travis, and Plaintiff Oldfather.

(17) On July 20, 1983, Defendant Tipton appeared at the District 8 office to conduct an investigation into the events of July 19, 1983. Defendant Tipton reported, "no person interviewed saw or heard any loud talk, blows struck or confrontation between either Mr. and Mrs. Travis or Mrs. Travis and Robin Oldfather."

(18) On or about July 28, 1983, Plaintiff Oldfather arranged a meeting at a restaurant. Plaintiff, Defendant Travis, then District 8 Deputy Director, Steven Petty, and Robert Turner, a friend of Mrs. Oldfather were present. Mr. Turner, at Mrs. Oldfather's request, advised the others that he had recently attended a meeting of Democratic Party officials, at which meeting the Warren County Democratic Party Chairman, Cecil Linkus, made remarks which were critical of Plaintiff Oldfather's relationship with Defendant Travis.

(19) On August 17, 1983, Plaintiff Oldfather was interviewed in Columbus by Robert C. Brown the then ODOT Deputy Director of the Division of Mass Transportation concerning a job in Mr. Brown's office in Columbus.

(20) An offer of a full-time permanent position in the Division of Mass Transportation in Columbus, at the same rate of pay ($8.65 per hour), was offered to Plaintiff prior to the expiration of her OA position.

(21) Plaintiff Oldfather met at her request with Defendants Smith and Tipton in Columbus on September 16, 1983, regarding her continued employment.

(22) Plaintiff rejected the position in Columbus.

(23) Plaintiff's employment ended September 17, 1983, when her temporary appointment (OA) expired.

(24) ODOT employee Richard Kelly was classified OA at District 8 with an expiration date of September 16, 1983. He was not terminated then. He remained an employee of ODOT District 8 at the date of trial, to wit: July 15, 1985.

(25) Defendant Travis was still employed at District 8 in the same position as of the time of trial. He has received no disciplinary action in connection with the affair with the Plaintiff. He has received at least one raise in salary since Plaintiff's termination.

(26) Robin Oldfather timely filed a charge of sex discrimination with the Ohio Civil Rights Commission and EEOC in connection with her separation from employment with ODOT, received her Notice of Right to Sue and timely commenced the within lawsuit.

(27) Plaintiff appealed her separation from employment to the State Personnel Board of Review. A hearing was held on December 6, 1983. The Personnel Board ruled that, as Plaintiff's appeal was from the end of a temporary appointment rather than a removal, it lacked jurisdiction and

dismissed the appeal. Such action was affirmed by the Franklin County Common Pleas Court and the Tenth Appellate District Court of Appeals.

(28) On January 30, 1984, Plaintiff applied for a posted position for Administrative Assistant 3 in ODOT District 8. Plaintiff was one of nine applicants for that position all of whom, with the exception of Plaintiff, were full-time permanent ODOT District 8 employees.

(29) Plaintiff Oldfather was interviewed for that position by Defendant Travis. The Administrative Assistant 3 position was filled by James Spurlock.

(30) Robin Oldfather timely filed a charge of sex discrimination with the EEOC in connection with ODOT's not hiring her for the position of District 8 Administrative Assistant 3, and timely amended her Complaint herein to include the allegations that were the subject of said EEOC charge.

(31) The individual Defendants at all relevant times were state officials. Many or all of the actions taken by them arose in the context of their employment as state officials.

B. FINDINGS OF FACT—In addition to the foregoing uncontroverted facts, the following facts have been established by the preponderance of the evidence.[1] The Court's findings of fact in this case do not rest upon the credibility of the Plaintiff alone, which credibility was, in large measure, successfully attacked on cross examination. Rather, the findings are based primarily upon the words and actions of the individual Defendants themselves (Smith, Tipton and Travis) which, to a large degree, both corroborated the testimony of the Plaintiff necessary for her to successfully establish her right to relief under her first and second claims and, to an even larger degree, furnished—independently of the Plaintiff's testimony—additional evidence upon which this Court has based its findings.

(1) Plaintiff Robin Oldfather was hired by ODOT on April 4, 1983, to serve as a confidential assistant, with non typing secretarial and clerical duties, to District 8 Administrative Assistant 4, Defendant, Robert J. Travis. She had previously worked under Defendant Travis at the Montgomery County Home. She was hired by ODOT at the request of Travis. She was terminated on September 17, 1983. Thereupon, her job duties (and many more) were assumed by a male employee, James Spurlock.[2] While many of the Plaintiff's job duties were those later described for an Administrative Assistant 3, a position which did not exist when Plaintiff was first employed by ODOT, she functioned primarily as a trusted confidential assistant, without many of the technical (requiring expertise) responsibilities and decision making functions later given Mr. Spurlock as an Administrative Assistant 3. With the exception of handling one particular assignment on her own (the hiring and assigning of seasonal help), the Plaintiff made no decisions on behalf of Travis concerning policies and procedures. She functioned, in Travis' behalf, on minor matters, such as the taking of phone calls, scheduling of appointments, etc. On balance, she did not perform the functions that were being performed by an Administrative Assistant 3 at the time of trial.

(2) Plaintiff was hired in an "over-authorized" ("OA") status because there was another employee incumbent in the position control number to which she was assigned. This other employee was on extended sick leave and District 8 was entitled to fill the position on an OA basis.

(3) OA appointments are technically temporary and Plaintiff's carried an expiration date of September 16, 1983. However, Dis-

---

**1.** Many of these findings of fact will duplicate, at least in part, certain of the uncontroverted facts set forth above. However, it is anticipated that these findings will add essential detail and nuances to the "bare bones" stipulations referred to in part A, *supra*.

**2.** In reality, Plaintiff's position was taken by Sheri Fannon, a clerical assistant type, rather than Spurlock.

trict 8 has never terminated an employee hired in an OA status at the expiration of his or her appointment, but has continued such persons on the payroll. OA appointments have invariably been used to start an employee working while District 8 personnel locate a permanent position in the District for that person. Indeed, Travis had told her that an OA status was like a training period and that after a few months, the designation would "come off" and she would be a permanent employee, capable of obtaining insurance on her own, etc.

(4) A male District 8 employee, Richard Kelly, was hired in an OA capacity with an appointment expiration date in September, 1983, virtually the same date as Plaintiff's. His employment continued, uninterrupted, beyond that date and he remained at District 8 as of the date of trial.

(5) While Plaintiff was employed at ODOT District 8, she received two performance appraisals, both excellent. The evidence demonstrates that Plaintiff worked hard, conducted herself in a professional manner, and was well-liked by co-workers. She was well qualified for the position she held. She performed same in a proficient manner.

(6) Plaintiff and Defendant Travis were involved in a romantic affair, a sexual, extramarital relationship, from May, 1981, to May, 1984.

(7) Shortly after Plaintiff began working in District 8, she became aware that there was talk in the community concerning her relationship with Mr. Travis. She received a phone call on May 10, 1983, from Betty McGary, an employee of the Butler County Board of Elections. Mrs. McGary called to caution Mrs. Oldfather that Cecil Linkus, the then chairman of the Warren County Democratic Party, was accusing Mrs. Oldfather and Mr. Travis of having a rather public affair and was making critical comments regarding the Oldfather-Travis relationship.

(8) On July 9, 1983, Bernard H. Hurst, the Assistant Director of ODOT, attended a Cincinnati Reds baseball game with, among others, several ODOT District 8 employees. On that occasion talk arose regarding Mrs. Oldfather and Mr. Travis being involved in an extramarital affair. Mr. Hurst, whose office was in Columbus, communicated this information to Defendants Smith and Tipton.

(9) Defendants Warren Smith and Morris Tipton received rumors of the affair several months after Plaintiff began working at District 8, presumably from the aforesaid Bernard Hurst. Smith summoned Travis to Columbus for a meeting with Tipton and him on July 12, 1983.

(10) At the July 12 meeting, Smith confronted Travis with rumors he had heard. Travis did not admit to the affair, stating, "I'm no angel but I'm not baring my soul to you people". Travis then stated that if there was a problem, he would fire Plaintiff. Smith told Travis that if he and the Plaintiff did anything to embarrass either the Department or the Governor, he (Smith) would fire them both. He told Travis to get Plaintiff out of Travis' office if indeed there was an affair going on. A suggestion was made that Travis might investigate the possibility of securing a job for Plaintiff in Montgomery County.

(11) Also on July 12, 1983, Defendant Smith interviewed Defendant Wallace for the position of District 8 Deputy Director. Mr. Wallace was not at that time employed by ODOT. Early in that interview, Director Smith stated that he had just spoken to the District 8 A.A. (Travis) regarding his (Travis) relationship with his assistant (Oldfather). Mr. Wallace replied that he had also heard about their relationship.

(12) On July 19, 1983, Smith received a telephone call from a non-ODOT employee, Warren County Democratic Party Chairman, Cecil Linkus, reporting that Travis' wife, Colette, had been in the District 8 office and had "caused a scene" by slapping Plaintiff or Travis and screaming at her husband. Smith ordered Defendant Tipton to investigate the incident.

(13) Tipton went to District 8 the next day and interviewed all District 8 employ-

ees who might have witnessed a disruption caused by Mrs. Travis' visit. Tipton reported to Smith that no one had seen or heard anything disruptive and that the incident had been greatly exaggerated. However, Mr. Tipton's report also stated that most employees interviewed "thought they [Oldfather and Travis] were having an affair and rumors to this effect were abundant." Tipton advised Travis to get to work on time, to curtail extended lunch hours and to "take Robin off his staff."

(14) Defendant Smith stated that he desired to separate Plaintiff and Travis for the good of ODOT. Attempts began to be made to find another job for Plaintiff Oldfather, if not outside of the District 8 office, then at least outside of Travis' office, in order that she and Defendant Travis would not be working together in the same office space. When no position could be found within District 8, an effort was made to place Plaintiff Oldfather outside the Warren County location of the District 8 office. It was Director's Smith's judgment that an affair between persons who held positions such as did Plaintiff Oldfather and Defendant Travis, resulted or could result in erosion of authority, morale problems, and an unfavorable picture of the Department. At all relevant times, however, he continued to view the situation as Travis' "problem" and looked solely to relocation of Plaintiff as the solution. Smith contended that he would not be able to relocate Travis because of his high salary (twice that of Plaintiff), lack of experience, and the fact that he did not possess a professional license in a relevant field such as, engineering or law. In addition, Smith contended that since Travis was a political appointee, he could not be transferred out of the district where his political base existed. The Court finds this reasoning suspect as Smith admittedly made no attempt to confirm whether this assumption concerning Travis' transferability was true or not. At that time, Smith had been on his job only a few months and was not terribly familiar with ODOT's staffing scheme. Yet, he did not direct anyone else to conduct even a cursory search of the vast ODOT system for a job into which Travis could be relocated. Even when he discovered that his earlier conclusion that Plaintiff could get a job at the Montgomery County garage had been proven to be "absolutely not true", he did not examine the validity of his assumption that Travis couldn't get a job elsewhere in ODOT. For purposes of the factual pattern of this case, Travis was similarly situated to the Plaintiff.

(15) Plaintiff was aware that movement was underway to place her outside of Mr. Travis' office.

(16) After Defendant Smith heard rumors of the affair between Travis and Oldfather, he remarked to Joe Shump, Montgomery County Democratic Chairman, that "he wasn't going to keep paying for Travis' having a good time in District 8."

(17) There is no evidence that Travis and Oldfather were ever indiscreet at their office. Defendant, Lloyd Wallace, Deputy Director at District 8, stated that he never observed anything that would indicate a romantic relationship between the two.

(18) Defendant Wallace testified that everytime he saw or spoke with Defendant Smith after July, 1983, until Plaintiff's termination, Smith would ask if Wallace witnessed or heard of anything regarding the affair. Wallace always replied he saw and heard nothing.

(19) On August 17, 1983, Plaintiff Oldfather was interviewed in Columbus by Robert C. Brown, the then ODOT Deputy Director of the Division of Mass Transportation, concerning a job as an administrative assistant in his office in Columbus at the ODOT central office. Plaintiff construed the position discussed as secretarial. She informed ODOT that she was not a secretary, and did not even type. Travis told her that the offer was no offer at all and that she need not accept it. Regardless of the nature of the job discussed, the Court finds that it was neither totally nor primarily secretarial. Even if the August 17 discussion concerned a secretarial position, when she met with Mr. Brown in Columbus

on September 16th, the discussion involved an administrative position.

(20) Mrs. Oldfather's husband, Larry Oldfather, commuted daily to his job in Columbus from their home in Dayton. Defendants Smith and Tipton were aware of this. An offer of a full-time permanent position in the Division of Mass Transportation in Columbus was offered to Plaintiff, at the same rate of pay that she was then earning at District 8.

(21) Plaintiff Oldfather met at her request with Defendants Smith and Tipton in Columbus on September 16, 1983, regarding her continued employment. She was urged to accept the position that had been offered her in Mr. Brown's office or to see Mr. Brown again and to interview for an administrative position in that office.

(22) Plaintiff, who lives in Dayton, did not feel she was strong enough to commute over three hours a day in addition to working a full day. Nor did she feel it reasonable to commute daily with a husband with whom she was in the process of ending her marriage. In addition, her husband's job duties and schedule were such as to make "schedule compatible" commuting an impossibility, even had her prospective employer been willing to be somewhat flexible in the hours in which she worked (she would still have had to work a 40 hour week). Also, Plaintiff's daughter was in her senior year of high school and Plaintiff wished to remain in Dayton until her daughter's graduation. Plaintiff had another teenaged child at home. She felt she could not commute to Columbus and keep a "handle" on her kids by getting up at 4:00 a.m. and returning home after the dinner hour. Plaintiff's commute to the Lebanon, Ohio District 8 office was approximately 35 minutes each way. She told Mr. Brown that she might be willing to relocate in Columbus after her daughter graduated.

(23) Plaintiff declined the job in Columbus. She was not told that she would not be kept on at District 8 and that she would have no job if she didn't take the offer in Columbus.

(24) While this job offer was a legitimate one, the Court finds, because of the commuting involved and the disruption to her personal life and that of her family that the commuting would have entailed, that it was not an offer of substantially equivalent employment. Her refusal to accept the Columbus job was reasonable.

(25) As the date for Plaintiff's OA expiration neared, District 8 personnel sent to Columbus the paperwork necessary to continue her in her position. This paperwork was returned unapproved.

(26) Defendant Tipton's office directed District 8 to send up termination papers for Plaintiff. When District 8 personnel asked if they should do the same for Richard Kelley whose OA was also expiring, they were told to leave him on the job. Defendant Smith stated that he would not have approved keeping Plaintiff in the job at District 8. Specifically, the Defendant Smith testified, and the Court so finds, that the rumors of the affair, not confirmed, would not have been enough to terminate her from full time, permanent employment with ODOT, or for that matter, even with District 8, outside of her then present position, but those rumors were sufficient to keep her from being, in effect, kept on in the OA position she then occupied or from being "upgraded" from her OA position to a full time, permanent position.

(27) Defendant Travis, the other partner in the affair, was not terminated and remained employed in the same position at the time of trial. He has received at least one raise in salary since Plaintiff's termination. He testified that another raise was to be forthcoming soon after the trial. He received, along with the other administrative assistants, an upgrading in classification to Deputy Director II. Travis has not been disciplined in any respect for his part in the affair.

(28) Travis was appointed to his unclassified position barely two months before Plaintiff was hired. He serves at the pleasure of Defendant Smith. Travis had no prior transportation-related experience and was by no means a unanimous choice

for this position. Defendant Smith expressed reservations about Travis' ability to manage labor relations, a major responsibility of his job, since Morris had a reputation of being too "confrontational" with labor. The Court finds from the evidence that Plaintiff was better qualified for her job than Travis was for his.

(29) Smith and Wallace stated, and the Court so finds, that they disapprove of a manager having an affair with a subordinate.

(30) In January, 1984, Plaintiff applied for the position of Administrative Assistant 3 in District 8. This position had been "pre-classed" or requested by District 8 while Plaintiff was employed. Plaintiff was one of nine applicants for that position, all of whom, with the exception of Plaintiff, were fulltime, permanent ODOT District 8 employees. Travis had told her that this job would be hers to fill. Plaintiff was not performing the duties of Administrative Assistant 3, while working for Defendant Travis, as that job was being performed at the time of trial. Specifically, Spurlock, as of the time of trial, was functioning as the liasion person between Travis' office and offices throughout District 8. He had budget, planning, and operations responsibilities. He took care of many complaints that came into the office. He not only helped Travis with the interviewing, he occasionally held them on his own. He performed research into Ohio Civil Rights Commission and EEOC complaints. In contrast to Plaintiff's five months with District 8, Spurlock had been in management at District 8 for 14 years. He had certain know-how with personnel, policies and procedures, that the Plaintiff lacked. He was, without question, the better qualified of the two for the position.

(31) As previously indicated, Defendants did not hire Plaintiff for the job. Instead they hired James Spurlock who was then performing Plaintiff's earlier job duties, as well as many of the additional job duties referred to in finding of fact number (30), *supra*. Spurlock was classified as a Highway Supervisor III and was cross-payrolled just as Plaintiff had been. However, he had been employed by ODOT since 1971. Most of his employment with ODOT had been spent as a supervisor. He was better qualified by background and experience than was Plaintiff for the position of Administrative Assistant 3, and ODOT's failure to hire Plaintiff was neither a result of discrimination based upon sex, nor in retaliation for her filing of an employment discrimination charge.

32. Defendant Smith stated he would not have allowed Plaintiff to be hired for the Administrative Assistant 3 position, even had District 8 wanted to hire her for that position, because of the deleterious effect on morale caused by the as yet unconfirmed rumors of the affair. Defendant Travis stated that he could not hire any woman for the job "after what they did to Robin" or "after what she went through." Neither of these findings of fact is relevant to the Plaintiff's claim of "discriminatory non-hire" or "non-hire by virtue of retaliation for her having previously filed a complaint of sex discrimination with the Ohio Civil Rights Commission," given the Court's finding that, unquestionably, she was not nearly as well qualified for the position of Administrative Assistant 3 as was the male employee hired to fill that position, James Spurlock.

(33) On January 30, 1984, the Defendant Travis had a meeting in Columbus with Defendants Smith and Tipton. Travis was "wired" during this meeting. The resultant tape of that meeting, which was played to the Court in both its original and in its enhanced form, clearly shows, by the requisite preponderance of the evidence (and more), that the reason the Plaintiff was "non-renewed" or "non-retained" (not upgraded to permanent, full time employment) was not the pretextual reason that her temporary employment or OA had elapsed, but rather that her temporary employment was allowed to lapse because of morals. Defendant Travis, during the meeting in question, stated a worry about disclosing in open court the fact that Plaintiff was let go because of "morals." De-

fendant Smith acknowledged that "that could be brought up", tacitly agreeing that "morals" was the reason for the discharge. There was a discussion on the tape about what prospective new employers of the Plaintiff would be told as to the reason why the Plaintiff was no longer employed at ODOT. When someone suggested that they couldn't very well say that Plaintiff's "OA went pop", there was a reaction from the three of them that is somewhat equidistant between a loud chuckle and uproarious laughter. This tape proves, beyond a doubt, that the Defendants articulated non-discriminatory reason for the Plaintiff's non-renewal or non-retention (that her temporary employment had lapsed) was blatant pretext. The real reason was morality— the morals of the Plaintiff.

(34) The actions of Defendants Smith and Tipton caused her extreme emotional distress, anxiety and embarrassment. As of the time of trial, she stated that she felt better about herself than ever before, and that she had been able to enter into a new, loving relationship with her new husband.

(35) Plaintiff has failed to prove any loss to her personal reputation, by a preponderance of the evidence, by virtue of the events set forth above.

(36) Plaintiff made reasonable efforts to secure comparable employment following her termination from ODOT. She had, as of the time of trial, sustained a loss of income as a result of her termination from employment with ODOT.

(37) At all relevant times, the individual defendants were acting under color of state law.

(38) Neither Defendant Wallace nor Defendant Travis engaged in any "actionable" conduct in regard to the facts relevant to the Plaintiff's second claim for relief, alleging a violation by the individual Defendants of her constitutional right to equal protection of the laws (42 U.S.C. § 1983, the only one of Plaintiff's claims for relief upon which she has been successful against the individual Defendants). Accordingly, judgment will be entered in favor of said Defendants on the second claims for relief.

(39) Neither Defendant Smith nor Defendant Tipton acted maliciously, wantonly or oppressively toward the Plaintiff in their discriminatory conduct leading to the termination of her employment at ODOT.

(40) The conduct of Defendant Smith and Defendant Tipton that caused Plaintiff's emotional distress, anxiety and embarassment was not extreme or outrageous.

## II. DISCUSSION

As noted above, Plaintiff's Complaint in this case states five causes of action:

(1) Count 1 alleges employment discrimination by the Ohio Department of Transportation on the basis of sex in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, arising out of the non-renewal of her temporary appointment on September 17, 1983;

(2) Count 2 alleges a violation by the individual Defendants acting under color of state law, of her constitutional right to equal protection of the law in violation of 42 U.S.C. § 1983, arising out of that same failure to renew employment;

(3) Count 3 alleges intentional and negligent infliction of emotional distress and damage to Plaintiff's reputation in the community caused by the individual Defendants' actions;

(4) Count 4 alleges that the individual Defendants discriminatorily refused to rehire Plaintiff in January, 1984, in violation of her constitutional rights, presumably as protected under 42 U.S.C. § 1983; and

(5) Count 5 alleges that this failure to rehire her by ODOT was done to discriminate against her on the basis of sex and in retaliation for her filing of a previous charge of discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*

For purposes of this discussion, the Court will separate its analyses of these claims into Title VII, § 1983 and negligent or intentional infliction of emotional distress claims.

**1178**

## A. Title VII Claims

■ The Supreme Court, beginning in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), has established a three part framework for proof in Title VII claims. Under this framework, Plaintiff must first establish a *prima facie* case, which creates an inference of individual discrimination. *See, e.g., Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). After the plaintiff has established his or her *prima facie* case, the employer must articulate "a legitimate, non-discriminatory reason" for the employment action. *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). Once an employer has articulated a legitimate non-discriminatory reason for the allegedly discriminatory act, Plaintiff must prove that that reason was pretext, "either directly by persuading the Court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. "The ultimate burden of persuading the trier of fact that the Defendant intentionally discriminated against the Plaintiff regarding the particular employment decision 'remains at all times with the Plaintiff,' [*Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093] and in the final analysis, the trier of fact 'must decide which party's explanation of the employer's motivation it believes.' *United States Postal Service Board of Governors v. Aikens*, 460 U.S. [711] at 716 [103 S.Ct. 1478, 1482, 75 L.Ed.2d 403] ...." *Cooper*, 467 U.S. at 876, 104 S.Ct. at 2799.

The elements of a *prima facie* showing vary in Title VII cases according to the particular factual situation of each case. *See Canham v. Oberlin College*, 666 F.2d 1057, 1060 (6th Cir.1981) ("We added, however, that this standard [for a *prima facie* showing] is not inflexible, as '[t]he facts necessarily will vary in Title VII cases, the specification above of the *prima facie* proof required from respondent is not nec-

essarily applicable in every respect in differing factual situations.' "). (quoting *McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13). In termination cases, such as the one now before the Court, three elements must be shown to establish a *prima facie* case:

(1) The Plaintiff was a member of a protected class (*i.e.*, women);

(2) Plaintiff engaged in conduct substantially the same as a similarly situated male employee of the Defendant; and

(3) Plaintiff was punished differently (*i.e.*, discharged) than the similarly situated male employee for such conduct by the Defendant employer.

*See Atkins v. City of Greensboro*, 39 F.E.P. Cases (BNA) 424 (M.D.N.C.1985) [Available on WESTLAW, DCTU database].

■ In Count 1 of the case now before the Court, it is uncontroverted that Plaintiff belongs to a protected class and that she was treated differently than a similarly situated employee who engaged in the same conduct (an affair): she is a woman and she was discharged while Defendant Robert Travis retained his job without punishment. Defendants, however, argue that Defendant Travis was not a similarly situated employee. Obviously, Defendant Travis engaged in the same conduct as the Plaintiff (*i.e.*, an extramarital, sexual relationship from May, 1981 through May, 1984). Defendants argue, however, that because of his high salary, lack of experience and lack of a professional license in a relevant field such as engineering or law, and because Travis' political base was in District 8, he could not be transferred as could the Plaintiff. However, as noted in the court's Findings of Fact (¶ 14), these contentions are not supported by the evidence at trial. Thus, the Court must conclude that Defendant Travis was indeed similarly situated to the Plaintiff. Accordingly, the Court concludes that Plaintiff did make a *prima facie* showing of employment discrimination so as to require Defendant to articulate a legitimate, non-dis-

criminatory reason for her termination from employment.

■ Defendant ODOT has articulated a legitimate, non-discriminatory reason for the termination of Plaintiff's employment—it claims that Plaintiff was terminated only because she was in an OA (over-authorized) or temporary position that expired at the time of her discharge. Since the Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's discharge, the presumption of discrimination created by Plaintiff's *prima facie* showing "drops from the case." *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 750 (6th Cir.1985) (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10). Thus, Plaintiff herein must show that Defendants' articulated reason for her discharge was pretext.

■ In the present case, however, the Plaintiff *has* shown by far more than a preponderance of the evidence that Defendants' articulated reason for her discharge was mere pretext. As this Court's Findings of Fact make clear, the temporary classification of Plaintiff's employment had no real meaning since no other "temporary" employee in District 8 of ODOT had ever failed to eventually receive permanent status. *See supra* Findings of Fact ¶ 3. The vast weight of the evidence at trial points to Plaintiff's affair with Defendant Travis as being the overwhelming concern of ODOT officials, rather than her status as a temporary employee. The tape of the meeting of ODOT officials made by Travis merely makes explicit what the overwhelming weight of the evidence at trial plainly points to—the real reason for Plaintiff's discharge was that she was a *woman* who engaged in "immoral" behavior with a male fellow employee.

Accordingly, the Court concludes that Plaintiff has shown that she was discharged in September of 1983 not because her temporary position had expired, but as punishment for conduct which was also engaged in by a retained male employee, and thus, that Defendant's articulated reason for her discharge was pretextual.

■ However, with regard to Count 1 of Plaintiff's Complaint, Defendants also argue that she was not discriminated against because she was offered a position in the Division of Mass Transportation of ODOT in Columbus. Defendants apparently assert that this position was substantially equivalent employment, and that Plaintiff's failure to accept that position constitutes a defense to her claim of employment discrimination. However, "the substantial equivalence of the position from which the Claimant was discriminatorily terminated must afford the Claimant virtually identical promotional opportunities, compensation, job responsibilities, work conditions and status." *Rasimus v. Michigan Department of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983). Furthermore, "[i]t is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where he [or she] refused to accept employment that is an unreasonable distance from his [or her] residence.... [I]n *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307 (D.C.Cir.1972), the Court held that the duty to make reasonable efforts to find employment did not obligate Claimants 'to seek work in Louisville or other areas located over fifty miles from Madison, due to the excessive commute such jobs would have entailed.' *Id.* at 1314." *Id.* at 625–26. Thus, the Court concludes that a job offer which would have required the Plaintiff to commute over three hours a day was not an offer of substantially equivalent employment. As further evidence of the reasonableness of Plaintiff's declining to accept this offer, the Court notes Plaintiff was either in the midst of a divorce, or was contemplating such a step, and had responsibility for raising two teenage children.

■ The Court, therefore, finds that Defendants' discharge of Plaintiff in September of 1983 constituted employment discrimination because of sex in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e, *et seq.*

■ On the other hand, the Court finds that Plaintiff has failed to prove the claim

in Count 5 of her Complaint of violation of Title VII in Defendants' refusal to hire her on January 30, 1984, for an Administrative Assistant 3 position in ODOT District 8 because of her sex and because of her prior filing of discrimination charges. While the Court believes that Plaintiff has made a *prima facie* showing of discrimination based on sex and in retaliation for her previously filed charge of sex discrimination with regard to the Administrative Assistant 3 position by her showing of the September, 1983 discrimination, the Court finds Defendants' articulated reason for not hiring her to be legitimate, non-discriminatory, and nonpretextual. Defendant has produced ample evidence to convince the Court that James Spurlock, who ultimately received that position, was better qualified than the Plaintiff. Thus, Plaintiff has failed in her burden of proof on her Title VII claim in Count 5 of her Complaint.

### (B) *§ 1983 Claims*

Counts 2 and 4 of Plaintiff's Complaint, as noted above, allege that the individual Defendants deprived Plaintiff of the equal protection of the laws by their employment decisions in violation of 42 U.S.C. § 1983.

Initially, the Court notes that § 1983 protects Plaintiff's right to the equal protection of the laws under the Fourteenth Amendment, but does not protect against retaliatory employment actions covered by Title VII. *See Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1204–05 (6th Cir.1984). Thus, to the extent that Count 4 of Plaintiff's Complaint could be construed to allege a claim for retaliation in Defendants' January, 1984 failure to hire her, that claim is not cognizable under § 1983. Furthermore, since the Court has found that Plaintiff was not hired in January of 1984 for the Administrative Assistant 3 position because of Mr. Spurlock's superior qualifications, and not because of her sex, the remainder of Count 4 must fail.

Turning to Count 2 of Plaintiff's Complaint, the Court notes that its finding of liability under Title VII for Count 1 indicates that the individual Defendants are also liable under § 1983. As the Sixth Circuit has stated:

A plaintiff who alleges disparate treatment by a state employer is bringing essentially the same claim under Title VII as under § 1983. If there is liability under Title VII, there should be liability under § 1983.

*Grano v. Department of Development of the City of Columbus*, 637 F.2d 1073, 1082 (6th Cir.1980). The Court notes, however, as indicated by its Findings of Fact (¶ 38), that neither Defendant Wallace nor Defendant Travis engaged in any of the conduct which constituted discrimination against the Plaintiff. Therefore, the Court's finding that Defendant ODOT violated Title VII in discriminating against Plaintiff on the basis of her sex creates § 1983 liability against only Defendants Tipton and Smith, as the ODOT officials responsible for the discriminatory decisions.

Plaintiff and Defendants in this case, however, agree that the individual Defendants are entitled to qualified immunity for any good faith conduct on their part which may have deprived Plaintiff of her constitutional right to equal protection of the laws. *See* Defendants' Post-Trial Memorandum (Doc. # 52) at 15; Plaintiff's Post-Trial Brief (Doc. # 53) at 11. The scope of such qualified immunity was set forth by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1981):

[G]overnmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Thus, the crucial question of fact with regard to the liability of Defendants Smith and Tipton is whether they reasonably should have known that their decision to terminate the Plaintiff violated her right to equal protection of the laws. The Court finds that they indeed should have known that their acts constituted a violation of Plaintiff's constitutional rights. In light of

the evidence presented in this case, it is clear that these Defendants made a decision to punish a woman for her "immoral" acts, while at the same time deciding not to punish a man who had committed precisely the same acts. It is inconceivable that officials with high level responsibility for employment decisions in ODOT could not have known of their responsibility not to discriminate on the basis of sex. Accordingly, the Court finds that Defendants Smith and Tipton are liable under 42 U.S.C. § 1983 for depriving Plaintiff of her right to equal protection of the laws.

However, while it has found that Defendants Smith and Tipton's conduct violated Plaintiff's equal protection rights as protected under § 1983, the Court cannot find that that conduct rises to the level of maliciousness or wantonness necessary to justify an award of punitive damages. Punitive damages should be considered by the trier of fact in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others." *Burkhart v. Randles,* 764 F.2d 1196, 1202 (6th Cir.1985) (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). In this case, Defendants Smith and Tipton were indifferent to the Plaintiff's constitutionally protected rights, but the evidence does not show that that indifference was either callous or reckless. The Court, therefore, cannot grant punitive damages to Plaintiff against Defendants Smith and Tipton for their violation of her right to equal protection of the laws.

In sum, the Court finds that none of the individual Defendants are liable under Count 4 of Plaintiff's Amended Complaint for violating Plaintiff's right to equal protection under the law as protected by 42 U.S.C. § 1983, and that Defendants Travis and Wallace are not liable for such violations under Count 2 of the Plaintiff's Complaint. Defendants Smith and Tipton are found liable under Count 2 of Plaintiff's Amended Complaint. However, the conduct of Defendants Smith and Tipton was not so recklessly or callously indifferent or malicious as to permit the award of punitive damages against either of them.

**(C)** *Negligent and Intentional Infliction of Emotional Distress*

Count 3 of Plaintiff's Complaint seeks recovery against the Defendants for negligent and intentional infliction of emotional distress upon the Plaintiff. Initially, the Court notes that Ohio cases awarding recovery for negligent infliction of emotional distress have involved situations in which bystanders to accidents sustained emotional injuries due to the shock resulting from observing the accident. *See, e.g., Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759 (1983). This is plainly not such a case.

Under Ohio law, in order to recover for intentional infliction of emotional distress, a plaintiff must prove four elements:

(1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff;

(2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of Torts Second (1965) 73, § 46, Comment D;

(3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and

(4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement of Torts Second 77, § 46, Comment J.

*Pyle v. Pyle,* 11 Ohio App.3d 31, 463 N.E.2d 98, 103 (1983); *see also Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 462 N.E.2d 392, 394 (1984) (citing § 46 of the Restatement of Torts Second as helpful in defining "extreme and outrageous" conduct.).

In the present case, the Court finds that the evidence shows that Plaintiff's mental anguish was serious and extreme. *See supra* Findings of Fact ¶ 34. The Court cannot, however, find that the Defendants' conduct was "extreme and

outrageous" as those terms have been defined by the Ohio courts in the context of the tort of intentional infliction of emotional distress. Quite simply, the Court cannot conclude that the Defendants' decision to punish the Plaintiff for her "immoral" behavior was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Reamsnyder,* 10 Ohio St.3d at 153, 462 N.E.2d at 394 (quoting Restatement of Torts Second § 46). Accordingly, judgment must be entered for the Defendants on Plaintiff's claim for intentional infliction of emotional distress.

**(D)** *Remedies*

■■■ Having found Defendant ODOT liable on Plaintiff's Count 1 Title VII claim and Defendants Smith and Tipton liable on Plaintiff's Count 2 § 1983 claim, the Court must now determine what remedy should be fashioned for these deprivations. In fashioning these remedies, the Court is cognizant of the guidance provided by the Sixth Circuit in *Ford v. Nicks,* 741 F.2d 858, 863 (6th Cir.1984):

> It is well settled that a district court may award reinstatement and full back pay to a victim of employment discrimination in violation of Title VII. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614 (6th Cir.1983) ....
> In order to encourage the goals of Title VII, district courts are given broad latitude to fashion remedies that make a victim whole by restoring him, as nearly as possible, to the position he would have been in had the discrimination not occurred. *Albemarle, supra,* 422 U.S. at 422, 95 S.Ct. at 2373; *Rasimas, supra,* at 626.

*See also Grubb v. W.A. Foote Memorial Hospital, Inc.,* 759 F.2d 546, 547 (6th Cir. 1985). The Court, accordingly, finds that Plaintiff should be reinstated to a position comparable to that from which she was terminated (from which she was non-retained or non-renewed), and awarded full back pay, less any sums earned by her in any subsequent employment from the date of her termination to the date of said reinstatement.

The Court notes, however, that it would be inappropriate to reinstate Plaintiff to an Administrative Assistant 3 position. At the time of her discharge, Plaintiff was not filling such a position nor has she been shown to be qualified to fill such a position. The Court therefore, keeping in mind that Plaintiff would have been upgraded to permanent, full time employment or, at the very least, retained or renewed in her OA status until permanent, full time employment became available, were it not for her non-renewal or non-retention because of her "morals", orders that Plaintiff be reinstated to a permanent, full time position for which she is objectively deemed qualified or, if such a position is not available at this time, to an OA position which shall ripen into a permanent, full time position for which she is qualified. By "objectively deemed qualified", the Court means that Defendant ODOT must, in good faith, evaluate Plaintiff's ability to fill any open positions. The Court will retain jurisdiction over this case to insure compliance with this Order.

The award of full back pay to the Plaintiff is also appropriate. However, based on the evidence produced at trial, the Court is unable to determine the proper amount of that back pay from the time of her discharge to the present. Accordingly, the Court will hold an evidentiary hearing on the issue of back pay. Should the parties be unable to agree upon a reinstatement position for the Plaintiff, the Court will also determine the exact position for reinstatement at that hearing.

Finally, the Court, based upon the evidence produced at trial, can find no damages to which Plaintiff is entitled under her § 1983 claim other than the back pay amounts which will be awarded on her Title VII claim. In so concluding, the Court notes that "the abstract value of a constitutional right may not form the basis for § 1983 damages". *Memphis Community School District v. Stachura,* — U.S. —, 106 S.Ct. 2537, 2544, 91 L.Ed.2d 249 (1986). Thus, the individual Defendants Smith and Tipton will be jointly and severally liable

for the amount of back pay determined to be appropriate by the Court at the evidentiary hearing.

## III. CONCLUSIONS OF LAW

(1) This Court has jurisdiction over the subject matter of this dispute under 28 U.S.C. §§ 1331 & 1343 and the doctrine of pendent jurisdiction.

(2) In discharging Plaintiff on September 16, 1983, Defendant ODOT intentionally discriminated against Plaintiff on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*

(3) Defendants Travis and Wallace did not act to knowingly deprive Plaintiff of her right to equal protection of the law with respect to her termination from employment on September 16, 1983, and so did not violate her rights as protected by 42 U.S.C. § 1983 with regard to that discharge.

(4) Defendants Smith and Tipton knowingly acted to deprive Plaintiff of her right to equal protection of the laws as protected by 42 U.S.C. § 1983 in acting to terminate her employment with Defendant ODOT on September 16, 1983.

(5) Defendants Smith and Tipton are governmental officials entitled to good faith immunity from liability for civil damages from violations of 42 U.S.C. § 1983. However, Defendants Smith and Tipton failed to act in good faith with regard to their actions leading to Plaintiff's September 16, 1983 discharge from employment, and so are liable for such civil damages.

(6) Defendants Smith and Tipton's violation of Plaintiff's right to equal protection of the laws in violation of 42 U.S.C. § 1983 and Defendant ODOT's violation of Title VII were the proximate cause of Plaintiff's loss of pay flowing from her September 16, 1983 termination from employment.

(7) Defendants Smith and Tipton did not act maliciously or with callous or reckless indifference to Plaintiff's constitutional rights in depriving Plaintiff of her equal protection of the laws, and so are not liable for punitive damages for their violation of 42 U.S.C. § 1983.

(8) Defendants' conduct towards Plaintiff constituted neither a negligent nor an intentional infliction of emotional distress upon her.

(9) Defendants Wallace, Travis, Smith and Tipton did not deny Plaintiff the equal protection of the laws in violation of 42 U.S.C. § 1983 in their failure in January, 1984 to hire her for the open Administrative Assistant 3 position in District 8, because the reason for her not being selected was that a better qualified candidate was available and offered the position.

(10) Defendant ODOT did not discriminate against the Plaintiff either on the basis of sex or in retaliation for her civil rights claims in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e, *et seq.*, by not offering her the Administrative Assistant 3 position available in District 8 in January, 1984, because the decision not to offer her that position was based upon the superior qualifications of the selected candidate.

(11) Defendant is entitled to be reinstated to a permanent, full time position with Defendant ODOT for which she is deemed objectively qualified or, if such a position is not presently available, to an OA position which shall ripen into a permanent, full time position.

(12) Plaintiff is entitled to full back pay from the time of her September 16, 1983 discharge from employment to the time of her reinstatement, less any sums earned by her in subsequent employment in that time period, in an amount to be determined at an evidentiary hearing before this Court.

Accordingly, judgment is entered in favor of Plaintiff and against Defendant ODOT on Count 1 of Plaintiff's Complaint. Judgment is entered in favor of Plaintiff and against Defendants Smith and Tipton on Count 2 of Plaintiff's Amended Complaint, but against Plaintiff and in favor of Defendants Travis and Wallace with regard to said Defendants' liability on Count 2. Judgment is ordered in favor of all Defendants and against the Plaintiff on Counts 3, 4 and 5 of Plaintiff's Complaint. Defendant ODOT is hereby ordered to reinstate Plaintiff to a permanent, full time position

for which she is deemed objectively qualified or, if such a position is unavailable at present, to an OA position which shall ripen into such a permanent, full time position. Defendant ODOT, Smith and Tipton are ordered to pay Plaintiff the amount of full back pay from the time of her termination to the time of her reinstatement (less any sums earned by Plaintiff in subsequent employment during that period) as found by the Court at an evidentiary hearing.

## IV. FURTHER PROCEDURES

A conference call will be held between the Court and counsel on Friday, October 10, 1986, at 4:30 p.m. for the purposes of setting a date for an evidentiary hearing on the amount of back pay damages and, if necessary, the details and terms of Plaintiff's reinstatement.