**Harbin v.**
**Ohio Dep't. of Mental Health**
*[Cite as 8 AOA 516]*

*Case No. 89AP-345*

*Franklin County, (10th)*
*Decided December 4, 1990*

*Larry R. Zingarelli, for Appellant.*

*Anthony J. Celebrezze, Jr., Attorney General, and Elizabeth Tarpy Kerns, for Appellee.*

STRAUSBAUGH, J.

On March 26, 1987, plaintiff, Sharon Harbin, filed a complaint in the Ohio Court of Claims naming as defendants the Ohio Department of Mental Health ("department"), Cambridge Mental Health Center, and Marsha Keadle ("Keadle"). Plaintiff had been an employee since 1978 with the department. More specifically, plaintiff had been employed as a technical typist at the Cambridge Mental Health Center. In January 1985, Keadle became plaintiff's supervisor. Plaintiff's complaint alleged, in part, that, "[d]uring the *** [two] years previous to the filing of this suit, defendant Keadle while acting as plaintiff's supervisor has intentionally or negligently inflicted emotional distress and suffering on Plaintiff."

Plaintiff's complaint alleged three incidents giving rise to her claim for emotional distress:

(1) "[o]n or about January 6, 1987, Keadle refused to let Plaintiff go home after a registered nurse determined that Plaintiff's blood pressure had risen to 148/110 ***";

(2) "[o]n or about December 14, 15, and 16, 1986, Keadle required Plaintiff to continue to work in a room that was being repainted *** Plaintiff was reprimanded by Keadle for leaving the paint fume, filled room ***"; and

(3) "Keadle is constantly rearranging [sic] Plaintiff's furniture and moving Plaintiff's work location."

On July 23, 1987, defendant filed a motion for stay of proceedings pending the outcome of a workers' compensation claim filed by plaintiff. On November 16, 1987, the Court of Claims dismissed plaintiff's complaint finding that plaintiff, by filing a claim for workers' compensation, was barred from pursuing a remedy in the Court of Claims against her employer based upon the actions of her coemployee.

Plaintiff appealed the dismissal of her complaint to this court. In *Harbin v. Ohio Dept. of Mental Health* (Mar. 29, 1988), Franklin App. No. 87AP-1194, unreported (1988 Opinions 1072), this court reversed the judgment of the Court of Claims and remanded the case for further proceedings.

On January 26, 1989, the case came for trial. By entry dated February 22, 1989, the Court of Claims rendered judgment against plaintiff on her claim.

On appeal, plaintiff sets forth the following sixteen assignments of error for review by this court:

"I. The trial court erred in holding that there is no cause of action for negligent infliction of emotional distress in employment conditions.

"II. The trial court erred in holding that appellant did not prove by a preponderance of the evidence that appellee negligently inflicted emotional distress upon appellant.

"III. The trial court erred in failing to find a breach of duty pertaining to the employment conditions as represented.

"IV. The trial court erred in holding that appellant did not prove that appellee intentionally or recklessly inflicted emotional distress upon appellant.

"V. The trial court erred in holding that the conduct of Marsha Keadle was not extreme and outrageous.

"VI. The trial court erred in refusing to admit testimony of Deborah McConkey regarding Keadle's treatment of appellant.

"VII. The trial court erred in refusing to admit testimony of Cheryl Logwood regarding Keadle's extreme and outrageous acts.

"VIII. The trial court erred in refusing to admit testimony of Consuela Leleckas regarding her reasons for retiring.

"IX. The trial court erred in refusing to admit testimony of Mary Beth Hammel regarding the effect of Keadle's behavior on the working conditions.

"X. The trial court erred in refusing to admit testimony of Mary Beth Hammel regarding her opinion of whether Keadle's behavior was appropriate.

"XI. The trial court erred in refusing to admit testimony of Jack Hayes regarding grievances filed against Keadle and the turnover rate in her department.

"XII. The trial court erred in refusing to admit testimony of Marsha Keadle regarding the turnover of personnel in her department.

"XIII. The trial court erred in refusing to admit testimony of Marsha Keadle regarding her vow to get rid of everybody.

"XIV. The trial court erred in refusing to permit cross examination of Marsha Keadle regarding her deposition testimony.

"XV. The trial court erred in failing to find that appellees were negligent and amend the pleadings in accordance with Civil Rule 15.

"XVI. The trial court erred in failing to find that appellee Keadle committed an intentional tort against appellant, i.e., assault."

Plaintiff's assignments of error numbers one, two, three, four, five, fifteen, and sixteen are interrelated and will be considered together. These assignments of error relate to the Court of Claims' rulings concerning plaintiff's allegations of negligence and intentional or negligent infliction of emotional distress.

Plaintiff first contends that the Court of Claims erred in denying her claim for negligent infliction of emotional distress. Concerning this claim, the Court of Claims held, in part, that:

"Upon review of the applicable case law and the facts of the case herein, the court is of the opinion that Ohio does not specifically recognize a cause of action which is based on claims of negligent infliction of emotional anxiety or distress due to employment conditions. ***

"*** However, assuming, *arguendo*, that such a negligent cause of action in the workplace would be recognized, the court does not find a breach of a duty pertaining to the employment conditions as represented. ***"
*Harbin v. Ohio Dept. Mental Health* (Feb. 22, 1989) Ohio Court of Claims No. 87-03970, unreported, 4.

In 1983, the Supreme Court of Ohio first recognized a cause of action for the negligent infliction of emotional distress without a contemporaneous injury. *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St. 3d 131. Later that year, in *Paugh v. Hanks* (1983), 6 Ohio St. 3d 72, recovery for this cause of action was allowed where a bystander to an accident sustained serious and foreseeable emotional injuries.

In *Oldfather v. Ohio Dept. of Transp.* (S.D. Ohio 1986), 653 F. Supp. 1167, 1181, plaintiff sought recovery for negligent infliction of emotional distress based upon termination of his employment. The court in *Oldfather*, in denying recovery, distinguished plaintiff's claim arising in an employment context from "*** Ohio cases awarding recovery for negligent infliction of emotional distress *** [involving] situations in which bystanders to accidents sustained emotional injuries due to the shock resulting from observing the accident. ***" *Id.*

In *Antalis v. Dept. of Commerce* (July 17, 1990), Franklin App. No. 89AP-548, unreported (1990 Opinions 3016, 3017), plaintiff filed a complaint in the Court of Claims against her employer alleging negligent infliction of emotional distress resulting from stress related to her former place of employment. Plaintiff's single assignment of error asserted that the Court of Claims erred in dismissing plaintiff's action based upon the court's finding that such a cause of action arising in an employment situation is not a justifiable issue.

In *Antalis*, this court stated that:

"While appellant argues that public policy requires the court to recognize a claim for negligent infliction of emotional distress in the workplace as part of an employer's duty to provide a safe working environment, absent a clear expression of intent from the Ohio Supreme Court, we decline to expand the application of this tort to include actions arising out of an employment situation. ***"
*Id.* at 3021.

See, also, *Kinney v. Ohio Dept. of Admin. Services* (Aug. 30, 1988), Franklin App. No. 88AP-27, unreported (1988 Opinions 3045). (Addressing plaintiffs' claim for negligent infliction of emotional distress arising from employment context, this court held that "*** [i]f the infliction of serious emotional distress is to be recognized herein, there must be proof of the independent tort of intentional infliction of emotional distress." *Id.* at 3052.)

Ohio law recognizes a cause of action for intentional infliction of emotional distress. *Yeager v. Local Union 20* (1983), 6 Ohio St. 3d 369. In *Yeager, supra*, the Supreme Court of Ohio held in the syllabus that:

"One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. ***"

The *Yeager* court adopted she standard for intentional infliction of emotional distress set forth in 1 Restatement of the Law 2d, Torts (1965), 71, Section 46(1).

The court in *Yeager*, in defining the term "extreme and outrageous," further quoted from Comment *d* to Section 46 of the Restatement, which states, in pertinent part:

"*** It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. ***'" *Yeager, supra*, at 374-375.

As noted in the decision of the Court of Claims, plaintiff's claim for intentional infliction of emotional distress focuses primarily on three incidents which plaintiff alleges gave rise to her complaint. The first incident involves plaintiff's allegation that Keadle was constantly moving plaintiff's furniture.

Keadle testified that an initial move involving plaintiff's furniture was prompted by the merging of the medical records department and the transcription department in order to consolidate those departments and to provide office space for another section.

Keadle testified that a second move occurred as a result of an employee complaining about the temperature at her work area being too cold. Concerning the second move, Keadle stated that "*** everybody agreed on the move." (Tr. 203.)

Keadle related that a third move was necessitated by the arrival of new equipment in the office. Keadle denied moving plaintiff's furniture in an effort to harass her.

Plaintiff also testified concerning the movement of her furniture:

"Q. Okay. Now Marsha Keadle came on board approximately January 12 of 1985; is that correct?

"***

"A. Yes.

"***

"Q. Okay. And shortly thereafter she moved your work site, along with the other two technical typists, to the downstairs area in with the medical records people; is that correct?

"A. Correct.

"***

"Q. And then you were moved again, weren't you?

"A. Yes.

"Q. Okay. And that was approximately March of '86, about a year later that your work site was moved after Mary Beth Hammel, one of your colleagues, asked Marsha Keadle to move you; isn't that correct?

"A. It was shortly after we moved downstairs. I'm not sure of March and the reason was because Marsha was hot and, I believe, Mary Beth was cold. There was some discussion between the two of them.

"***

"Q. *** Okay. So your furniture or your work site got moved in March of 1985 because Mary Beth Hammel requested the move because she was cold; is that right?

"A. Yeah, I believe so.

"Q. Okay. And then your work area moved again in October of 1986 when some new equipment came in; isn't that correct?

"A. I'm not sure of the month. I had a move, I believe, prior to that one. Is the equipment you're talking about the new dictaphone?

"Q. Yeah.

"A. Yeah, I believe there was a move between those two.

"Q. You were here in the room yesterday when Marsha testified about getting a power pack and some new tape recorder or tape machines?

"A. Yes, I was.

"Q. *** Your work site, along with everybody else's, was moved when that new equipment was moved in; isn't that correct?

"A. Yes.

"***

"Q. You had your work site moved approximately four times in the two years that Marsha Keadle was your supervisor; isn't that correct?

"A. My own desk at least four times, yes." (Tr. 5-10.)

Concerning the movement of plaintiff's furniture, the Court of Claims found that "*** [t]he testimony provided *** did not show that the furniture was moved an exorbitant number of times ***. In addition, the movement of furniture *** was done for valid reasons. ***"

A second incident involves plaintiff's allegation that Keadle required plaintiff to work in a room that was being painted. Plaintiff's complaint alleged that plaintiff was reprimanded by Keadle for leaving the room.

The testimony concerning this incident indicates that, in December 1986, the office area where plaintiff worked was being painted over a two or three-day period. Plaintiff testified that, on the first day of painting, she arrived in the morning to her work area where painters were preparing to start their task. Plaintiff stated that Keadle was not in the room that morning. Plaintiff related that at 1:00 p.m. she began experiencing a headache from the paint fumes. At that time, plaintiff went across the hallway where Keadle was located and asked Keadle if she could go upstairs to work the remainder of the day. Plaintiff testified that Keadle said "yes," and plaintiff then proceeded to spend the rest of the day working upstairs.

Plaintiff testified that, on the second day of painting, she arrived at work, gathered her equipment, and went upstairs to work without informing Keadle. Plaintiff testified that she received a verbal reprimand for not telling Keadle where she was going. Plaintiff acknowledged, however, that Keadle was not the supervisor who reprimanded her. Rather, it was another supervisor who verbally told plaintiff that she should have informed Keadle where she was going. Keadle testified that she had nothing to do with any reprimand that plaintiff received as a result of the painting incident.

A third incident, cited by plaintiff, involves a dispute between plaintiff and Keadle pertaining to a telephone call plaintiff received at work on January 6, 1987. Plaintiff testified that Keadle had a policy whereby personal telephone calls were only to be made during lunch hour or on breaks.

On January 6, 1987, plaintiff received a telephone call from her husband regarding plaintiff's daughter who had been ill. Keadle, who was nearby at the time, approached plaintiff and asked plaintiff whether the call was business related or personal. Plaintiff gave the following testimony concerning this incident:

"Q. When Marsha Keadle asked you whether or not you were on a personal phone call or a business phone call, you did not answer her; isn't that correct?

"A. I didn't answer her while I was on the telephone.

"Q. And when she asked, you the second time, you didn't answer her the second time either; isn't that correct?

"A. No, I didn't.

"Q. She asked you a third time, and for the third time, you didn't answer her, did you?

"A. No.

"***

"Q. Mrs. Harbin, when you did finally answer Marsha Keadle's question, your answer was, it's none of your business; isn't that correct?

"A. Yes, it was." (Tr. 19-20.)

Debbie McConkey ("McConkey"), a coworker of plaintiff, also testified concerning the telephone incident:

"Q. *** What happened that day? What did you see that you can recall?

"A. I returned from my lunch. Marsha was standing up in front of Sharon, between Sharon and her typewriter. They were having words, and I observed Sharon crying, and they proceeded to have words. And at one point, Sharon stood up and she took her headset off. At which time I heard a clink or something to the effect of them hitting the desk or floor, whatever they may have hit.

"Q. Did you hear whatever words they were having?

"A. Parts of them.

"Q. Okay. Was Mrs. Harbin screaming at Ms. Keadle?

"A. She wasn't screaming at her. She was in an upset tone of voice crying. She wasn't screaming.

"Q. Did you hear Ms. Keadle yell or scream at Mrs. Harbin?

"A. Not screaming, no.

"***

"Q. Okay. What else do you remember about that incident?

"A. Nothing other than the fact that Sharon asked Marsha to just get away from her and get out of her face and leave her alone.

"Q. Did you observe anything happen after that?

"A. Nothing other than the noise of the headset that Sharon took off.

"Q. Did Ms. Keadle leave the room?

"A. After she told Sharon that they would talk after Sharon got settled down. She left and went to lunch.

"***

"Q. *** Did you hear Mrs. Harbin make the comment to Ms. Keadle that she wished the phone was Ms. Keadle's face so that she could bash it in?

"A. I recall it being said. ***" (Tr. 67-69, 71.)

Based upon review of the record, the Court of Claims determined that "*** plaintiff has not proven by a preponderance of the evidence that defendant's actions, through Keadle, were extreme and outrageous. ***" We agree and find that, accepting the facts most favorable to plaintiff, the actions alleged by plaintiff were not "*** so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. ***" *Yeager, supra*, at 375.

As noted by the Court of Claims, the evidence indicates that "*** the working atmosphere in the office was tense and unpleasant for the plaintiff. ***" However, while the behavior of plaintiff's supervisor might be characterized as insensitive at times, the actions cited do not rise to the level of "extreme and outrageous" conduct. Accordingly, the Court of Claims did not err in denying plaintiff's claim for intentional infliction of emotional distress.

Concerning plaintiff's claim for negligence, the Court of Claims determined that "*** plaintiff has not shown by a preponderance of the evidence that defendant breached any duty under the circumstances ***." We agree and hold that the evidence in this action does not give rise to a claim for negligence against defendant.

Plaintiff further alleges that the trial court erred in failing to find that Keadle committed an assault against plaintiff. The apparent basis for plaintiff's contention concerns the incident involving the telephone call. The evidence concerning this incident does not support plaintiff's claim that she was subjected to assault.

Based upon the foregoing, plaintiff's assignments of error numbers one, two, three, four, five, fifteen, and sixteen are overruled.

We next address plaintiff's sixth and tenth assignments of error. Both of these assignments of error concern the exclusion by the Court of Claims of opinion testimony by department employees regarding Keadle's behavior toward plaintiff. Plaintiff contends that the opinion testimony of McConkey and Mary Beth Hammel ("Hammel") should have been allowed at trial pursuant to Evid. R. 701.

Evid. R. 701 provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

"*** The primary purpose of Rule 701 is to allow nonexpert witnesses to give opinion testimony when, as a matter of practical necessity, events which they have personally observed cannot otherwise be fully presented to the court or the jury. ***" *Urbana, ex rel. Newlin, v. Downing* (1989), 43 Ohio St. 3d 109, 112. The decision whether to admit certain testimony under Evid. R. 701 is left to the sound discretion of the trial court and we may not reverse absent an abuse of discretion. *Id*. at 113.

In the present case, we fail to see how the opinions of McConkey and Hammel concerning Keadle's behavior toward plaintiff were "*** helpful to a clear understanding of

\*\*\* [the witness'] testimony on the determination of a fact in issue." Here, the factfinder was as well-qualified as the lay witnesses to draw conclusions from the facts, and such opinion testimony was therefore properly excluded. There was no abuse of discretion in the exclusion of the opinions of the two witnesses.

Plaintiff's assignments of error numbers six and ten are overruled.

Plaintiff's assignments of error numbers seven, eight, nine, eleven, twelve, thirteen, and fourteen are interrelated and will be discussed together. Under these assignments of error, plaintiff argues that it was error for the trial court to exclude testimony concerning Keadle's relationship with employees other than plaintiff.

Plaintiff contends that such testimony is admissible under Evid. R. 405(B)[1]. Plaintiff maintains that the character of Keadle is an essential element of her claim for intentional infliction of emotional distress.

In general, under Ohio Law, character evidence is excluded in civil actions:

"\*\*\*[E]ven where fraud is imputed or dishonor is charged, except in actions for libel, slander, malicious prosecution, seduction, or assault and battery, in which, by reason of the nature of the action, the character or reputation of a party becomes a matter in issue.\*\*\*" *Lakes v. Buckeye State Mutual Insurance Ass'n.* (1959), 110 Ohio App. 115, 118.

We reject plaintiff's contention that the testimony of coworkers concerning specific instances of Keadle's behavior should have been admissible pursuant to Evid. R. 405(B). The character of Keadle is not an essential element of plaintiff's claim for intentional infliction of emotional distress.

Even assuming that the proferred testimony was admissible under some other rule (*e.g.*, to show intent under Evid. R. 404 (B), the admission or exclusion of the testimony was within the domain of the trial court, and we will not reverse unless there has been a clear and prejudicial abuse of discretion. See *O'Brien v. Angley* (1980), 63 Ohio St. 2d 159; *Claderon v. Sharkey* (1982), 70 Ohio St. 2d 218. The Court of Claims did not err in excluding the disputed testimony.

Plaintiff's assignments of error numbers seven, eight, nine, eleven, twelve, thirteen,

and fourteen lack merit and are hereby overruled.

Based upon the foregoing, plaintiff's sixteen assignments of error are overruled, and the judgment of the Ohio Court of Claims is affirmed.

*Judgment affirmed.*

McCORMAC and GOLDSBERRY, J.J, concur.

GOLDSBERRY, J., of the Athens County Court of Common Pleas, sitting by assignment in the Tenth Appellate District.

--------

[1] Evid. R. 405 (B) provides:

"\*\*\*In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."